In re ICH CORP., f/k/a Southwestern Life Company, Debtor.

In re SWL Holding Corporation, Debtor.

In re Facilities Management Installation, Inc., Debtor.

In re Care Financial Corporation, Debtor.

Susan A. Brown, as Managing Trustee of the Lone Star Liquidating Trust, Plaintiff–Appellant,

v.

Victor L. Sayyah, Defendant–Appellee.

No. 3:98–CV–2197–D.
Bankruptcy Nos. 395–36351–RCM–11 to 395–36354–RCM–11.
Adversary No. 397–3110.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 4, 1999.

Robert B. Krakow (argued), Peter C. D'Apice, and I. Richard Levy of Gibson, Dunn & Crutcher, L.L.P., Dallas, TX for plaintiff-appellant.

Jack L. Kinzie, Bobbie T. Shell (argued), and Brenda T. Rhoades of Baker & Botts, L.L.P., Dallas, TX for defendant-appellee.

FITZWATER, District Judge.

This appeal presents the question whether the bankruptcy court erred in holding that a debenture did not, as a matter of law, include original issue discount ("OID"). Concluding that the bankruptcy court erred, its judgment is reversed and this adversary proceeding is remanded for further proceedings.

I

■ The relevant background facts are largely undisputed and may be found in the bankruptcy court's decision below. *In re I.C.H. Corp.*, 219 B.R. 176, 179–81 (Bankr. N.D.Tex.1998). On June 1, 1981 Sayyah Corporation entered into a stock purchase agreement ("Agreement") with American Commonwealth Financial Corporation ("ACFC"). Under the Agreement, ACFC acquired Sayyah Corporation's controlling equity interest [1] in HCA, Inc. ("HCA") [2] for a stated price of $45 million, payable $15 million in cash due at closing and by the execution and delivery of a 20–year debenture ("Debenture") [3] with a face value of $30 million, bearing an interest rate of 10% per annum.[4] ACFC also guarantied the Debenture pursuant to a guaranty dated October 15, 1981 ("Guaranty"), which was in turn secured by a $37.5 million letter of credit ("Letter of Credit").

Under the terms of the Debenture, an ACFC subsidiary was obligated to make interest payments to Sayyah Corporation beginning with a prorated payment of $1,375,000 on March 31, 1982 and continuing with

payments of $3 million annually until March 31, 2001. The $30 million redemption value of the Debenture was due in a single payment upon the October 15, 2001 maturity date. The Debenture also provided that ACFC could prepay the indebtedness for an amount below the Debenture's face value on three specific dates: (1) on October 15, 1986, for a payment of $24,125,000; [5] (2) on October 15, 1991, for a payment of $26,625,000; or (3) on October 15, 1996, for a payment of $29,125,000.

After ACFC received the necessary regulatory approvals, the parties closed the transaction on October 15, 1981. At this time, an ACFC subsidiary paid Sayyah Corporation $15 million cash and executed and delivered the $30 million Debenture to Sayyah Corporation. Sayyah Corporation subsequently assigned the Debenture, the Guaranty, and the Letter of Credit to Sayyah, and debtor ICH Corporation ("ICH") became the direct obligor under the Debenture due to a merger with ACFC.[6]

ICH later attempted to obtain about $368 million in financing to acquire other insurance companies. To meet certain conditions imposed by the lenders, ICH sought to amend various aspects of the deal. On October 29, 1984 Sayyah agreed to an amendment of the Debenture that released ICH from its Guaranty and released the Letter of Credit that secured the Guaranty. In consideration for these releases, ICH relinquished its right to prepay the Debenture and, as substitute collateral for the Letter of Credit, agreed to loan Sayyah up to $29.5 million under a revolving credit loan agreement ("Revolving

---

1. This interest equaled 1,892,325 shares of HCA, Inc. stock, or approximately 66.7% of its outstanding shares.

2. HCA was a holding company that owned and controlled life insurance companies domiciled in several states.

3. Contrary to its label, the debt instrument that ACFC issued was not a "debenture" in its truest sense. A debenture is a long-term debt security that is issued, pursuant to a trust indenture, to a large number of investors in order to raise capital. *See Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 940–42 (5th Cir.1981) (en banc). The Debenture in this case was issued only to one enti-

ty—Sayyah Corporation—and therefore more closely resembles a promissory note.

4. The Debenture's 10% interest rate was below the 19% prevailing market interest rate for debentures in 1981.

5. The October 15, 1986 prepayment amount of $24,125,000, plus the scheduled interest payments for 1982 until 1986, totaled $37.5 million, which was the amount of the Letter of Credit.

6. After the merger, ICH recorded the Debenture on its books, using generally accepted accounting principles, as a debt in the amount of $17,153,000.

Credit Agreement"). Between 1984 and 1994 Sayyah borrowed an aggregate amount of $27 million (the "ICH Loans") under the Revolving Credit Agreement. The ICH Loans were made due and payable on October 15, 2001, which corresponded with the Debenture's maturity date. The parties later amended the Revolving Credit Agreement so that the dates on which Sayyah was to make interest payments on the ICH Loans corresponded to the dates on which ICH was to make interest payments to Sayyah under the Debenture. Rather than paying Sayyah the entire amount of interest due, ICH offset the interest owed on the Debenture by the interest due under the ICH Loans and paid Sayyah the excess.

ICH filed a voluntary chapter 11 petition on October 10, 1995. Sayyah timely filed a proof of claim listing the Debenture and stating that it was subject to partial setoff.[7] ICH originally scheduled Sayyah's claim in the aggregate amount of $31,250,000, which was composed of $28,064,835.63 that was secured by right of setoff due to the ICH Loans and $3,185,165.00 that constituted an unsecured claim.[8]

On February 7, 1997 the bankruptcy court entered an order confirming ICH's first amended joint plan of reorganization. This order created the Lone Star Liquidating Trust (the "Trust"), named plaintiff-appellant Susan A. Brown ("Trustee") as the trustee, and authorized ICH to convey to the Trust its rights, title, and interest in Sayyah's obligations to ICH.

The Trustee then brought the instant adversary proceeding in which she objected to Sayyah's proof of claim. The Trustee contended that Sayyah was improperly seeking to recover OID in the Debenture that had not accrued as of the petition date, and that an offset of the parties' debts resulted in Sayyah's owing a debt to the Trust. Sayyah and the Trustee subsequently filed cross-motions for summary judgment, disputing *inter alia* whether the Debenture contained OID. The bankruptcy court granted Sayyah's motion in part, holding that the Debenture did not, as a matter of law, contain OID. *I.C.H.*, 219 B.R. at 188.

The parties then tried the remaining issues to the bankruptcy court, which held that the setoff of the debts was effected on February 15, 1997, the effective date of ICH's reorganization plan, but that 11 U.S.C. § 502(b) required the court to calculate Sayyah's claim, as affected by the setoff, by using the amounts owed by ICH and Sayyah as of the petition date. Using this method of calculation, the bankruptcy court held that Sayyah had an allowed unsecured claim for $3,246,390 and was entitled to collect costs and attorney's fees in the amount of $362,402.26. The Trustee appeals.

II

This court reviews the bankruptcy court's summary judgment ruling *de novo*, applying the same standards as did the bankruptcy court. *In re Maple Mortgage, Inc.*, Civil Action No. 3:94–CV–0457–D, slip op. at 5–6 (N.D.Tex. Apr. 18, 1995) (Fitzwater, J.), *aff'd*, 81 F.3d 592 (5th Cir.1996). The court views the evidence favorably to the Trustee as the summary judgment nonmovant,[9] *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 40 (5th Cir.1996), and draws all justifiable inferences in her favor, *Tonkawa Tribe of Okla. v. Richards*, 75 F.3d 1039, 1043 (5th Cir.1996).[10]

---

7. Sayyah did not, however, seek relief from the automatic stay or petition for the right to effect the setoff.

8. ICH did not admit the validity of the claim, and it reserved the right to dispute the validity of the claim.

9. Although the Trustee also moved for summary judgment, she was the nonmovant with respect to the partial summary judgment now on appeal. The court therefore analyzes the Trustee's contentions as those of a summary judgment nonmovant.

10. As noted, part of the judgment on appeal was entered following a trial. The standard of review that applies in that context is different. The court reviews the bankruptcy court's conclusions of law *de novo*, *In re Ambassador Park Hotel, Ltd.*, 61 B.R. 792, 798–99 (N.D.Tex.1986) (Fitzwater, J.), but reviews its fact findings only for clear error, *In re Johnson Southwest, Inc.*, 205 B.R. 823, 827 (N.D.Tex.1997) (Fitzwater, J.). Because the court need not address in this appeal the bankruptcy court's trial rulings, these standards do not apply.

### III

The Trustee argues that the bankruptcy court committed reversible error when it held that the Debenture did not, as a matter of law, contain OID.

### A

OID results when an entity issues a debt instrument for consideration that is less than its face value. *In re Pengo Indus., Inc.,* 962 F.2d 543, 546 (5th Cir.1992); *In re Chateaugay Corp.,* 961 F.2d 378, 380 (2d Cir. 1992). The discount equals the difference between the debt instrument's face value (also called the stated principal amount or the redemption value) and the proceeds received by the issuer.[11] *Pengo,* 962 F.2d at 546; *Chateaugay,* 961 F.2d at 380. This discount compensates for a submarket interest rate and therefore is in the nature of additional interest. *Pengo,* 962 F.2d at 546. For tax and accounting purposes, borrowers amortize the discount over the life of the debt instrument, with the entire face value due and payable on the maturity date. *Chateaugay,* 961 F.2d at 380. Because OID is in the nature of interest, a creditor may not recover unamortized OID in a bankruptcy proceeding. *Pengo,* 962 F.2d at 546; *see* 11 U.S.C. § 502(b)(2) (disallowing creditor from obtaining unmatured interest).

### B

The Bankruptcy Code does not provide guidance concerning how to determine the existence of OID in a debt-for-stock transaction.[12] Circuit courts likewise have not had occasion to address whether OID was created in a debt-for-stock transaction. The two circuits that have decided OID issues have done so in the specific context of a debt-for-

debt exchange in a consensual, out-of-court workout. *See Pengo,* 962 F.2d at 549–50; *Chateaugay,* 961 F.2d at 381–83.

In *Pengo,* for example, the Fifth Circuit decided an appeal that involved a bankrupt corporation that had originally issued debentures with a face value of $1,000. *Pengo,* 962 F.2d at 544–45. The debentures were traded on the open market and eventually had a market value of $680. *Id.* at 548. The entity later faced financial difficulty and, in an attempt to avoid bankruptcy, restructured its debt by exchanging two new debentures for one issued earlier. *Id.* at 545. The new debentures had an aggregate face value of $1,000, which equaled the face, but not the market, value of the old one. *Id.* In both *Pengo* and *Chateaugay,* the bankruptcy courts held that the new debentures contained OID because the market value of the old debenture was less than the new debentures' face value. *See id.; Chateaugay,* 961 F.2d at 380.

The Second and Fifth Circuits disagreed with the bankruptcy courts, holding that the new debentures did not contain OID. In so doing, they limited their holdings to "the narrow issue of whether a debt-for-debt face value exchange generates OID." *Id.* at 549; *see Chateaugay,* 961 F.2d at 381–83. These decisions were controlled not by a general principle concerning OID, but rather by the unique transactions conducted by the bankrupt entities—consensual workouts used in attempts to avoid bankruptcy. *See Pengo,* 962 F.2d at 546–50; *Chateaugay,* 961 F.2d at 381–83. These types of transactions implicated strong policy concerns, such as the bankruptcy policy favoring the speedy, inexpen-

---

11. A typical example of OID is reflected in a transaction in which an entity issues a $1,000 promissory note, or a debenture, in exchange for $900. The $100 difference represents the discount. *See Pengo,* 962 F.2d at 547.

12. The legislative history of § 502(b)(2) offers an example of OID, explaining that OID is created when an entity issues a $1,000 note in exchange for $900 cash. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 352–53 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6308–09. This illustration demonstrates the existence of OID only when the proceeds received by the issuer have a

definite dollar amount, *e.g.,* $900. It does not address how to calculate the value of the proceeds when the issuer receives property, such as stock, that has a value that may fluctuate over time based on factors such as market demand and a party's subjective opinion. *Cf.* Gary B. Wilcox & David M. Rievman, *Restructuring Troubled Debt under the New Debt Exchange Rules,* 10 Va.Tax Rev. 665, 669 n. 28 (Winter 1991) (noting that "legislative history of § 502(b)(2) does not address how [OID] is to be determined in the context of a pre-bankruptcy exchange offer.").

sive, and negotiated resolution of disputes, Congress' intent to encourage consensual workouts, and the desirability of reducing bankruptcy filings. *Chateaugay,* 961 F.2d at 382–83; *see Pengo,* 962 F.2d at 549. If such a transaction created OID, the courts reasoned, creditors who participated in workouts would have lower claims in future bankruptcy proceedings than would those creditors who refused to exchange their debentures. *Pengo,* 962 F.2d at 549; *Chateaugay,* 961 F.2d at 382. This would create a strong disincentive for creditors to cooperate in consensual workouts of struggling companies, thereby impeding desirable bankruptcy policies. *Pengo,* 962 F.2d at 549; *Chateaugay,* 961 F.2d at 382.[13] The instant case, which involves the purchase of common stock in exchange for a debt instrument, does not involve such policy issues and is not guided by these opinions.

*In re Allegheny Int'l, Inc.,* 100 B.R. 247 (Bankr.W.D.Pa.1989), is also distinguishable. In that case, the bankrupt entity had exchanged one debenture, which had a face value of $25, for each share of its previously-issued preferred stock, which traded on the public market at approximately $15.81 per share. *Id.* at 248–49. Although that case involved a debt-for-equity exchange, its facts are too dissimilar to apply its legal reasoning here. First, there was no question whether the debentures in that case contained OID. The issuer expressly stated in the prospectus that the debentures would contain some amount of OID. *See id.* at 248. The court had no occasion to decide whether the instrument contained OID; it instead considered only the amount of OID in the debentures and the creditor's ability to recover the OID from the debtor. Second, the court did not have to refer to a variety of subjective sources to compute the value of the proceeds received for the debt instrument. Because the debentures given in exchange for the preferred stock were publicly traded on the market after issuance, the court was able to look to the debentures' trading price on the day of the exchange to determine their value. *See id.* at 255. The present case, however, does not permit the court to examine the trading price of the securities because the Debenture was not traded publicly and the market price of the HCA stock did not account for any control premium.

## C

Absent guiding precedent, the court now considers whether the bankruptcy court erred in granting summary judgment in favor of Sayyah.

ACFC and Sayyah Corporation originally executed the Agreement to consummate an arrangement in which ACFC would purchase 1,892,325 shares of HCA stock that Sayyah Corporation owned. *See* Sayyah App.Ex. 5 at 1. The Agreement set forth the terms and conditions of the stock purchase and expressly stated that the stock had an aggregate purchase price of $45 million, payable $15 million in cash and by the $30 million Debenture. *See id.* at 3. Sayyah contends that the parol evidence rule governs this case because the Agreement unambiguously states that the aggregate amount of the Debenture and the cash, which totaled $45 million, equaled the parties' stated purchase price of the stock. *See id.* The court disagrees.

■■■■ Bankruptcy policy mandates that the court determine the existence of OID by considering evidence outside the parties' agreement. *Cf. Pengo,* 962 F.2d at 549 (basing holding solely on bankruptcy policy argument); *Chateaugay,* 961 F.2d at 381–83 (same). Bankruptcy law provides that un-

---

13. *See* Victor Brudney, *Corporate Bondholders and Debtor Opportunism: In Bad Times and Good,* 105 Harv.L.Rev. 1821, 1860 & n. 115 (1992); John C. Coffee & William A. Klein, *Bondholder Coercion: The Problem of Constrained Choice in Debt Tender Offers and Recapitalizations,* 58 U.Chi.L.Rev. 1207, 1248 n. 121 (Fall 1991); Richard L. Epling, *Exchange Offers, Defaults, and Insolvency: A Short Primer,* 8 Bankr. Dev.J. 15, 44 (1991); Ford Lacy & David M. Dolan, *Legal Aspects of Public Debt Restructuring: Exchange Offers, Consent Solicitations and Tender Offers,* 4 DePaul Bus.L.J. 49, 58–59 (Fall/Winter 1991); *see generally* Robin E. Phelan & Stacey Jernigan, *OID and the "LTV Risk": An Original Investment Disaster,* 567 PLI/Comm 465 (1991).

dersecured creditors should only be allowed to recover debt that has accrued as of the petition date. *See* 11 U.S.C. § 502(b)(2); *see also* Nicholas P. Saggese, *et al., A Practitioner's Guide to Exchange Offers and Consent Solicitations,* 24 Loy.L.A.L.Rev. 527, 550 (1991) (noting that § 502(b)(2) "protects the debtor and its other creditors from the assertion of claims for amounts in excess of the benefit actually conveyed to the debtor."). Undersecured creditors are not permitted to recover any part of a debt that represents unaccrued interest as of the filing of the bankruptcy petition, even if the parties have tried to disguise the interest as principal. *See Pengo,* 962 F.2d at 546. Were the court to apply the parol evidence rule in the manner for which Sayyah contends, OID would never exist if the parties stated in their contract that a debt instrument, and the property given in exchange, had the same value. This would impermissibly permit creditors to make interest appear to be principal and then collect the unearned interest in contravention of the policy underlying § 502(b). Moreover, bankruptcy law provides that creditors should be treated equally. *See Joint Indus. Bd. of the Elec. Indus. v. United States,* 391 U.S. 224, 228, 88 S.Ct. 1491, 20 L.Ed.2d 546 (1968); *In re Pointer,* 952 F.2d 82, 86 n. 4 (5th Cir.1992). If the parol evidence rule controlled, the court would be compelled to base its determination of the existence of OID on the specific words that the parties used in the transaction. This in turn could cause unequal application of § 502(b)(2), depending on how the contract in question was drafted. The rule that would result from this approach would subject creditors to unequal treatment that contravenes Bankruptcy Code policy. The court therefore declines to apply the parol evidence rule.

■ There is persuasive, although not controlling, authority that the court should look beyond the four corners of the Agreement. Under the Tax Code,[14] OID exists when the debt instrument's stated redemption price at maturity exceeds its issue price.

26 U.S.C. § 1273(a)(1). When a debt instrument is issued for property that is traded on an established market, the issue price of the debt instrument equals the fair market value of the property received. *Id.* § 1273(b)(3). The Tax Code therefore determines the existence of OID by examining evidence other than a specific contract's language.

There is further support for this rule in dicta contained in *Chateaugay.* The Second Circuit in *Chateaugay* declined to look beyond the face value of the exchanged notes, but stated that a different rule could apply outside the context of a debt-for-debt exchange in a consensual workout. *See Chateaugay,* 961 F.2d at 382 (stating that bankruptcy court's holding "may seem irrefutable at first glance" but ignored importance of context and policy of promoting out-of-court resolution of disputes); *cf.* Chad C. Coombs, *Original Issue Discount in Debt-for-Debt and Debt-for-Stock Exchanges,* 65 Am. Bankr.L.J. 649, 669–73 (1991) (reasoning that value of stock in debt-for-stock exchange should not be based on face value of debt instrument). Thus the Second Circuit in dicta may apply a different approach in a situation, such as the present one, that does not involve a consensual workout.

■ The Bankruptcy Code also requires that the court look beyond a contract's language when determining whether interest is unmatured. In this context, the Code requires that the court determine the maturity of interest without reference to any *ipso facto* or any bankruptcy clause in the agreement creating a claim against the bankrupt entity. *See Allegheny,* 100 B.R. at 250 (noting that bankruptcy affects the relationship between debtor and its creditors). Thus the Bankruptcy Code in other contexts requires that a court look beyond the parties' agreement when determining claims recoverable in a bankruptcy case. This persuasive authority provides further confirmation that the court should consider extrinsic evidence, as well as the language used by the parties in

---

**14.** Tax law is not controlling authority in the bankruptcy context, but a court may refer to it as

persuasive authority. *See Pengo,* 962 F.2d at 550.

their agreement, when determining whether OID exists in a debt instrument.

Even if the court were to conclude that it should consult the parol evidence rule, this principle would not settle the issue on summary judgment. The parol evidence rule bars the introduction of extrinsic evidence concerning a prior or contemporaneous agreement to vary or contradict the terms of an unambiguous and fully integrated agreement. *See In re Marriage of Pylawka*, 277 Ill.App.3d 728, 214 Ill.Dec. 651, 661 N.E.2d 505, 510 (Ill.App.1996);[15] *Magnus v. Lutheran Gen. Health Care Sys.*, 235 Ill.App.3d 173, 176 Ill.Dec. 209, 601 N.E.2d 907, 914 (Ill.App.1992). Contrary to Sayyah's contention, the parol evidence rule would not bar the Trustee's extrinsic evidence of OID. The Trustee asserts in part that the prepayment provisions of the Debenture *inter alia* indicate that the price of the stock was less than $45 million. This provision is contained in the Debenture, to which the Agreement refers. *See* Sayyah App.Ex. 5 at 3; Ex. 7 at 2. Because the entire contract must be viewed as a whole, *see Magnus*, 601 N.E.2d at 913, the parol evidence rule does not bar the court from considering this evidence to determine whether the value of the stock was actually $45 million or a lesser amount. Moreover, the contract language is ambiguous. Although the contract states that the aggregate price of the stock is $45 million, *see* Sayyah App.Ex. 5 at 3, the fact that Sayyah agreed to a prepayment of the Debenture at a price lower than its face value indicates that the stock may not in fact have had a value of $45 million. Because of this ambiguity, the evidence as to the value of the stock is not limited by the parol evidence rule. *See Pylawka*, 661 N.E.2d at 510. Finally, the parol evidence rule would not bar extrinsic evidence as to the value of the stock. The parties' statement of the stock's aggregate price is a recitation of fact that may be contradicted by extrinsic evidence. *See* WILLISTON ON CONTRACTS § 7:23, at 424 (4th ed.1992); RESTATEMENT (SECOND) OF CON-

TRACTS § 218(1) (1981). Therefore, even if the court were to consider the effect of the parol evidence rule, it would not apply to bar the Trustee's evidence.

### D

The court now determines whether Sayyah was entitled to summary judgment that the Debenture did not, as a matter of law, contain OID. As noted, OID exists when the face value of a debt instrument exceeds the value of the consideration given in exchange for the debt instrument. *Pengo*, 962 F.2d at 546. The parties do not dispute that the face value of the Debenture was $30 million. Because ACFC gave Sayyah Corporation the Debenture plus $15 million in cash for the stock, the determination whether OID exists depends on whether the stock was worth $45 million at the time of the transaction.

Sayyah presented some evidence that the stock was worth $45 million: the Agreement recited that it was worth $45 million, and ICH stated in a Securities and Exchange Commission filing that the stock was worth this amount. Sayyah App.Ex. 5 at 3; Ex. 9 at 10. The Trustee, however, has pointed the court to the Debenture's prepayment provision and the Letter of Credit. The prepayment provision allowed ICH to retire the Debenture before its maturity date at an amount below the Debenture's stated face value. *See* Sayyah App.Ex. 7 at 2 (permitting ICH to pay back $24,125,000 on October 15, 1986; $26,625,000 on October 15, 1991; or $29,125,000 on October 15, 1996). ACFC also provided Sayyah Corporation the Letter of Credit to secure its debt on the Debenture. *See* Trustee App.Ex. 114. The Letter of Credit was in the amount of $37.5 million, which equals the $24,125,000 that ICH could prepay on October 15, 1986, plus the scheduled interest payments for 1982 until 1986. *See id.* at 2. Evidence that a party can prepay a loan for an amount lower than its stated principal amount, and that the

---

**15.** The parties do not dispute that Illinois law governs the Agreement's provisions. *See* Sayyah

App.Ex. 5 at 38.

Letter of Credit guarantees an amount less than the debt instrument's face value, indicates that the parties may not have valued the stock as worth $45 million. The issue whether the Debenture contained unamortized OID therefore cannot be resolved by summary judgment because a dispute exists as to the value of the HCA stock on the exchange date. The bankruptcy court erred in granting summary judgment for Sayyah on this issue.

## IV

The Trustee also maintains that the bankruptcy court erred when it concluded that it must calculate Sayyah's debt to ICH as of the effective date of the setoff rather than as of the petition date, and allowed Sayyah to recover costs and attorney's fees. Upon remand of this case, the bankruptcy court must determine whether the Debenture contained OID and, if it did, in what amount. Depending on this finding, Sayyah may become an oversecured creditor. If so, he may obtain post-petition interest on his claim, and potentially the attorney's fees he seeks, as provided in the Debenture. *See* 11 U.S.C. § 506(b). Because the resolution of these issues depends on the bankruptcy court's determination of the OID question, it would be premature for the court now to decide these questions.

\* \* \* \* \* \*

The bankruptcy court's judgment is REVERSED and this adversary proceeding is REMANDED for further proceedings consistent with this opinion.