In re Leonard Leo NARY,
Jr., et al., Debtors.

Leonard Leo Nary, Jr.,
Plaintiff–Appellee,

v.

The Complete Source, et
al., Defendants.

United States of America, on behalf of
U.S. Department of Education, William D. Ford Direct Loan Program,
Defendant–Appellant.

No. Civ.A. 3:00–CV–0908–D.
Bankruptcy No. 399–31094–RCM–7.
Adversary No. 99–3278.

United States District Court,
N.D. Texas,
Dallas Division.

Oct. 13, 2000.

Rosemary J. Zyne, Dallas, TX, for plaintiff-appellee.

Katherine Savers McGovern, Assistant United States Attorney, Dallas, TX, for defendant-appellant.

FITZWATER, District Judge.

Finding that the debtor had met the undue hardship requirement of 11 U.S.C. § 523(a)(8), the bankruptcy court partially discharged several education loans, including a consolidated loan that the debtor had obtained to refinance his law school indebtedness, and awarded the creditors pro rata recoveries from the nondischarged por-

tions of the loans. The court must decide in this appeal whether the bankruptcy court erred in its application of the *Brunner* test and whether § 523(a)(8) authorized it to grant partial discharges and to make pro rata awards to the creditors. For the reasons that follow, the court affirms in part and vacates and remands in part.

I

Plaintiff-appellee Leonard Leo Nary, Jr., Esquire ("Nary"), and his wife, Sharon Ivins Nary ("Mrs. Nary"), filed a no-asset bankruptcy in February 1999. They listed approximately $90,051.00 in loans that Nary had obtained between 1989 and 1992 to finance his law school education. The Narys also specified approximately $100,000 in additional unsecured debt, a substantial part of which represented unpaid medical expenses. They obtained a discharge of their general unsecured debt.

Nary initiated an adversary proceeding under § 523(a)(8) against The Complete Source ("EduCap"),[1] Consern Education Loans ("Consern"),[2] William D. Ford Federal Direct Loan Program ("Ford Program"), U.S. Department of Education ("DOE"), EAB,[3] The Education Resource Institute ("TERI"), and Southern Methodist University ("SMU") to discharge the education loans. Finding that Nary had established undue hardship, the bankruptcy court discharged all but $12,000 of his indebtedness, plus interest of 9% per annum, and ordered that his education creditors recover pro rata. The bankruptcy court analyzed the Nary family's monthly living expenses and Nary's monthly business expenses and found that, without precluding Nary from maintaining a minimal standard of living for himself and his fami-

ly, he could pay $200 per month from August 2000 until he had paid the nondischarged indebtedness in full, a period of approximately 6½ to 7 years. As a result, Nary's liability on the Ford Program loan ("Ford loan") was reduced from approximately $47,500 to $6,324.00, plus 9% interest per annum. The United States of America ("United States"), on behalf of the Ford Program and DOE, appeals.

II

"The court reviews the bankruptcy court's conclusions of law *de novo,* but reviews its fact findings only for clear error." *In re ICH Corp.,* 230 B.R. 88, 91 n. 10 (N.D.Tex.1999) (Fitzwater, J.) (citations omitted). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *In re Johnson Southwest, Inc.,* 205 B.R. 823, 827 (N.D.Tex.1997) (Fitzwater, J.) (quoting *In re Placid Oil Co.,* 158 B.R. 404, 412 (N.D.Tex.1993) (Fitzwater, J.)). "If the trier of fact's account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse it." *Id.* "[T]his court does not find facts. Neither is it free to view the evidence differently as a matter of choice." *Id.* "The bankruptcy judge's 'unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected.'" *Id.* (quoting *Endrex Exploration Co. v. Pampell,* 97 B.R. 316, 323 (N.D.Tex.1989) (Fitzwater, J.)).

The bankruptcy court made the following factual findings in its memorandum opinion. This court supplements them with pertinent facts that are uncontested,

---

1. The Complete Source is owned by Educational Resource Institute a/k/a EduCap, Inc. and will be referred to as EduCap unless the context otherwise requires.

2. Consern is the former name for The Complete Source. Consern defaulted in response to Nary's adversary complaint and his indebt-

edness to Consern was discharged in its entirety.

3. EAB (identified at the hearing as European American Bank) defaulted in response to Nary's adversary complaint and his indebtedness to EAB was discharged in its entirety.

supported by the record, or consistent with the bankruptcy court's other findings.

Nary is 41 years old and Mrs. Nary turned 40 in February 2000. At the time of the December 6, 1999 adversary hearing in this case, they had two daughters, ages three and seven, and were expecting the birth of their third child in June 2000.[4]

Nary graduated from college in 1980 with an accounting degree and later became a Certified Public Accountant ("CPA"). He had extreme difficulty retaining employment, holding approximately eight jobs during a nine-year span.[5] Nary was fired from his very first position after only approximately six months, and the longest he held a job was about two years.

Unsuccessful in the accounting field, Nary enrolled as a law student at SMU in 1989, graduating in 1992. Due to his lackluster academic performance and a tight job market, he was unable to find employment as a lawyer following graduation. He initially worked as an accountant (he was fired after about four months), then as a contract attorney, and finally on his own as a personal injury lawyer. His practice was "a disaster," and he closed it and voluntarily entered a psychiatric hospital on May 1, 1996. He was hospitalized from May until August 1996 for extreme depression and because he posed a danger to himself and others. In 1997 Nary's psychiatrist, Gordan Dennis Dalton, M.D. ("Dr. Dalton"), released him for part-time employment.

Nary has had mental health problems over the past decade. According to Dr. Dalton, who has known him since 1990, Nary first saw him due to "[d]ifficulty with depression and difficulty being successful in really almost anything he was trying to do." R. 83. Nary suffers from chronic major depression, marked by Obsessive–Compulsive and Narcissistic Personality Disorder. He has difficulty with authority and appropriate expressions of anger, combined with explosive outbursts. Although Nary has trouble handling stress, Dr. Dalton did not discourage him from attending law school.[6] Dr. Dalton opined that Nary was not able to handle accounting well because of his inability to deal with stress, detail work, and anything that requires constant repetitive effort. He concluded that Nary is bright and intelligent, as evidenced by his ability to complete law school and pass the Bar examination, but that he suffers from a chronic disorder, part of which is Major Depression Disorder. Nary also has significant personality disorders, with narcissistic tendencies, and low self-esteem. Presently, Nary sees Dr. Dalton on a maintenance schedule—once per month, on average, at a cost of $200 per visit. Dr. Dalton opined that Nary could expect gradual improvement with intensive treatment, that is, four to five visits per week, at a cost of $200 per visit. Absent such treatment, Dr. Dalton does not expect much improvement. He believes that Nary possibly can improve without treatment over the next 20 to 30 years, but "it would be very iffy." R. 88. Nary has recently been involved in the mental health equivalent of the Alcoholics Anonymous 12–Step Program. Although he has completed the program, he must make constant effort. Dr. Dalton opined that Nary is no longer a danger to himself or others.

Nary's mental stability appears to have improved since his 1996 mental breakdown. In July 1997 Nary was employed for approximately 20 hours per week in the bankruptcy field. He had no office of his own and freelanced for other attorneys.

4. According to Nary's brief, Mrs. Nary gave birth to a daughter on June 2, 2000. *See* Appellee Br. at 1 n. 1.

5. Nary has not practiced accounting steadily since the 1990s. Due to his inability to pay professional license fees, he has not actively maintained his certification as a CPA.

6. Dr. Dalton specializes in the treatment of licensed professionals, including lawyers, doctors, and pilots.

At the time of the adversary hearing, he was using, at no charge, a spare office at an attorney's firm, but this arrangement was to terminate in 60 days, and Nary had not made alternate arrangements. Nary's practice consists primarily of "non-contested" consumer bankruptcy cases, for which there is heavy competition. Consumer bankruptcies in this district have been declining for approximately the last six months. Nary has performed overflow bankruptcy work for other lawyers. Julianne M. Parker, Esquire, for whom Nary worked, opined that he could handle routine work, but not complex, detailed matters or stressful contested bankruptcy litigation. Nary was unable to work as an attorney for other bankruptcy lawyers due to his inability to process paperwork. He was never able to find enough contract work to make ends meet.

Mrs. Nary, who graduated from SMU in 1982 with a degree in sociology, works one night per week, for 3½ hours, at a home improvement store. She has been employed there for about two years and earns $8.00 per hour, for a monthly total income of approximately $85.00.

Mrs. Nary quit full time employment in 1994, when the couple's seven-year-old daughter was two. This child has been diagnosed with Paranoid Personalty Disorder and Obsessive–Compulsive Disorder, for which she is undergoing treatment and taking Prozac. She also suffers from auditory processing problems that impact her ability to do schoolwork at the expected level. The requirement that Mrs. Nary work extensively with this child interferes with her ability to work outside the home. She is employed part-time because of her daughter's problems and the need to devote much individual time to her. Although Mrs. Nary would be freed up for

extended work outside the home if Nary babysat their children, she has legitimate concerns about his doing so due to his inability to handle stress and the fact that he loses his temper with the children.

Since graduating from college, Mrs. Nary has held three full-time jobs. She worked for seven years for a major department store chain as a merchandising operating assistant. The most annual income she has earned is $40,000.

The Narys' income has fluctuated in recent years. Their 1996 tax return reflected a net loss of $9,882.00. In 1997 they reported adjusted gross income of $26,618.00 and net income of $25,658.00. In 1998 they had adjusted gross income of $35,653.00, netting $10,809.00 after expenses. In 1999 Nary averaged approximately $4,000 per month in gross receipts from his law practice, totaling approximately $48,000 through the December 6, 1999 adversary hearing date. Nary's business started declining in the last half of the year, when he lost work from an attorney from whom he received $1,200 to $1,400 monthly, and he expected his gross receipts for 1999 to be approximately the same as 1998.

The Narys own two older model automobiles with high mileage (a 1988 car with 145,000 miles and a 1989 car with 109,000 miles, respectively).[7]

The Narys claimed the following monthly living expenses, totaling $5,068.00:

| | |
|---|---|
| Home mortgage | $1,252.00 |
| Electricity | 175.00 |
| Water and sewer | 80.00 |
| Telephone | 75.00 |
| Mobile telephone | 100.00 [8] |
| Home maintenance | 115.00 [9] |
| Food, toiletries, diapers | 650.00 |
| Clothing | 130.00 |
| Laundry/dry cleaning | 65.00 |

7. Nary testified to slightly different mileage figures of 146,000 miles for one vehicle and 106,000 to 108,000 miles for the other. *See* R. 174.

8. The bankruptcy court found that because Nary practices law on a freelance basis from his home, the mobile telephone is his only business line.

9. The bankruptcy court found that the $115.00 monthly expense for home maintenance is due to supposed slab and foundation problems.

| | |
|---|---|
| Medical/Dental | 525.00 [10] |
| Transportation | 260.00 |
| Recreation | 95.00 |
| Charitable contributions | 65.00 |
| Life insurance | 125.00 |
| Health insurance | 117.00 [11] |
| Automobile insurance | 109.00 |
| Business expenses | 950.00 |
| Maternity expense | 180.00 [12] |
| TOTAL | $5,068.00 |

Nary has no disability or medical insurance. He visits Dr. Dalton monthly. Mrs. Nary and the children have medical insurance, but it does not cover maternity expenses and has a high deductible. They do not have retirement or savings accounts. The Narys have a child with psychological problems. Mrs. Nary presumably made monthly doctor visits in connection with her pregnancy. There may be hospital expenses not reimbursed by medical insurance.

The bankruptcy court found that the Narys' claimed medical and maternity expenses of $705.00 appear to be overestimated in the range of approximately $360; the $650 per month expense for food appears to be overestimated in the range of $100 per month; Nary's monthly business expenses of $950 are overestimated by approximately $200; and the expenses for clothing, laundry, and dry cleaning are overestimated by approximately $100. Consequently, the bankruptcy court found that $760 to $910 of the claimed monthly expenses of $5,068.00 are overestimated, resulting in reasonable expenses totaling in the range of approximately $4,300, that is, $4,150 to $4,300.[13]

Nary owes $28,000 in back taxes to the Internal Revenue Service. Although these unpaid taxes will be a priority claim, the maximum possibly owed and not discharged will be in the range of $3,064.00.[14]

Nary's monthly business expenses consist of advertising ($300), business lunch ($50), Bar dues ($35), postage/office supply ($150+), transportation ($250), and rent ($200). Although at the time of the adversary hearing Nary was not paying office rent, he anticipated that he would begin paying at least $200 monthly due to changing circumstances. Nary testified that $250 per month for car expense was necessary because of the difficulty keeping his high mileage car operable. The bankruptcy court found that when it combined Nary's claimed monthly business expense of $250 for transportation with the family's budgeted amount of $260 per month, transportation expenses were excessive by approximately $150 per month.

Although Nary obtained no loans for his undergraduate education, he borrowed heavily between 1989 and 1992 to attend law school. On February 14, 1996 he consolidated several loans into a Ford loan in the amount of $39,719.00. As of the February 5, 1999 petition date, his indebtedness on the Ford loan had increased to approximately $47,500.[15] Prior to bankruptcy, Nary was indebted to SMU for a 1991 student loan of $1,445.00. This loan carried interest at 5% with a monthly payment of $34.22. Nary owed EduCap $14,-

---

10. The bankruptcy court found that the Narys' monthly medical expenses total $705.00 when the $200 fee for Nary's monthly visit to Dr. Dalton is included.

11. The insurance covers only Mrs. Nary and their children.

12. This expense includes only the doctor's fees, not hospital charges. Mrs. Nary delivered the couple's first children by Caesarean Section.

13. The bankruptcy court found that this amount does not take into account possible unreimbursed hospital expenses, if any, from the June 2000 birth of the Narys' child or any unanticipated expenses.

14. In a footnote in his statement of the case, Nary disputes the bankruptcy court's finding that this debt will not be pursued, and contends that the entire debt of $28,000 to $30,000 remains outstanding. *See* Appellee Br. at 6 n. 4. Nary did not cross-appeal the bankruptcy court's judgment, however, and this contention is not preserved for review.

15. There is testimony in the record that the balance equaled $47,423.17 at the time of the adversary hearing.

463.97.[16] He owed TERI the sum of $26,643.25 for four loans taken out in 1990 through 1992, for which the minimum monthly payment is $150. Nary thus owed the total principal sum of $90,051.00, or $82,818.00 if the EduCap indebtedness is reduced from $14,463.97 to $7,230.00.[17]

Nary paid on his student loans from 1990 through May 1996, when he entered the psychiatric hospital. Although Nary made payments of approximately $5,938.00 toward the Hinson–Hazelwood GSL and Hinson–Hazelwood SLS loans, which were consolidated into the Ford loan, he has made no payments on the Ford loan itself. Nary paid $23,587.00 to EduCap, $5,130.00 to EAB, approximately $16,000 to $17,000 to TERI, and $2,249.00 to SMU.[18] He made $10,000 in loan payments to a creditor whom his records do not identify. In sum, he has paid about $33,000 toward his student loans.[19]

### III

To achieve the goal of affording a debtor a fresh start, the Bankruptcy Code provides that many debts are dischargeable. Section 523 of the Code contains several exceptions to discharge that reflect Congress' determination "that the creditors' interest in recovering full payment of debts ... outweighed the debtors' interest in a complete fresh start." In re McLeroy, 250 B.R. 872, 878 (N.D.Tex.2000) (Cummings, J.) (quoting Grogan v. Garner, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). One exception relates to student loan debt. Student loan "debt is not automatically discharged or automatically excepted from discharge in a bankruptcy proceeding. Instead, student loan debt is afforded its own standard of dischargeability, namely, section 523(a)(8)[.]" Cara A. Morea, Note, Student Loan Discharge in Bankruptcy—It Is Time for a Unified Equitable Approach, 7 Am.Bankr.Inst.L.Rev. 193 (1999) (footnotes omitted) [hereinafter Morea, Student Loan Discharge in Bankruptcy ]. Section 523(a)(8) "was enacted to prevent indebted college or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans." In re Hornsby, 144 F.3d 433, 436–37 (6th Cir. 1998) (citing In re Cheesman, 25 F.3d 356, 359 (6th Cir.1994)). It limits the dischargeability of education loans "unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]" 11 U.S.C. § 523(a)(8).[20]

16. EduCap and Nary stipulated to a settlement whereby EduCap would have a maximum allowed nondischargeable claim of $7,230, with a possible further reduction if Nary prevailed at the adversary hearing against the non-settling defendants and the bankruptcy court held that the average percentage of outstanding student loan claims determined to be nondischargeable was less than 50%. Thus, for example, if Nary discharged all but 10% of the other creditors' claims, EduCap would only have a nondischargeable claim for 10% of Nary's indebtedness.

17. Nary contends that, as of the adversary hearing date, he owed $98,423.39 to these creditors. See Appellee Br. at 6.

18. Nary testified at the adversary hearing that he probably paid approximately $10,000 more toward education loans.

19. Nary contends that he has made $64,165.00 in payments. Appellee Br. at 5,

12–13. The bankruptcy court found, apparently based on Nary's own testimony, see R. 178–79, that he has paid approximately $33,000. Because this finding is not clearly erroneous, the court will use the $33,000 figure in analyzing the issues on appeal.

20. 11 U.S.C. § 523(a)(8):

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—... (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

 "Congress has not defined 'undue hardship,' leaving the task to the courts. Courts universally require more than temporary financial adversity and typically stop short of utter hopelessness." *Hornsby,* 144 F.3d at 437. To decide whether a debtor will incur an undue hardship, many courts, including the bankruptcy court here, have followed the *Brunner* test. *See In re Brunner,* 46 B.R. 752, 756 (S.D.N.Y.1985), *aff'd,* 831 F.2d 395 (2d Cir. 1987) (per curiam) (adopting district court test). Under *Brunner* the debtor must establish

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner,* 831 F.2d at 396.

 Although the Fifth Circuit has yet to adopt *Brunner,* Judge Cummings of this court has applied this test, *see McLeroy,* 250 B.R. at 875, as have other courts in this circuit, *see In re Poche,* 1995 WL 688782, at *3 (E.D.La.1995); *In re Coveney,* 192 B.R. 140, 141 (Bankr.W.D.Tex. 1996); *In re Raisor,* 180 B.R. 163, 166 (Bankr.E.D.Tex.1995); *In re Stebbins–Hopf,* 176 B.R. 784, 786–87 (Bankr. W.D.Tex.1994). Several circuit courts have adopted *Brunner* as the proper framework for deciding whether excepting a debt from discharge will impose an undue hardship on the debtor and his dependents. *See In re Pena,* 155 F.3d 1108,

1112 (9th Cir.1998); *In re Faish,* 72 F.3d 298, 305–06 (3d Cir.1995); *In re Roberson,* 999 F.2d 1132, 1135 (7th Cir.1993).[21] *Brunner* "is the test that has been most widely applied." *Hornsby,* 144 F.3d at 437. Both the United States and Nary assume the validity of the *Brunner* formulation in asserting their respective positions on appeal. Accordingly, the court will apply *Brunner* as well.

IV

A

Under the first *Brunner* element, the bankruptcy court considered whether Nary had proved that he cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the student loans.

 The bankruptcy court found that although the Narys' projected annual family income of $48,000 to $50,000 per year is 2.2 times the 1999 poverty guideline of $19,520.00 for a family of five,[22] courts do not rely conclusively on these guidelines. The court cited cases in which courts have discharged student loans despite debtor incomes that substantially exceeded the poverty guidelines, held that Nary's expenses exceed his present income, and found that Nary had satisfied the threshold test because he cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the student loans.

 The United States maintains that the bankruptcy court erred in finding that Nary's expenses exceed his present

---

21. The Fourth Circuit has applied *Brunner* in an unpublished opinion. *See In re Kasey,* 187 F.3d 630, 1999 WL 507274 (4th Cir. July 19, 1999) (per curiam) (table).

22. The bankruptcy court treated the Narys as a family of five because they were expecting the birth of a child in June 2000 and any attempted realistic payment of the debts at issue would necessarily be on a long range

basis. The United States argues in its reply brief that the court erred as a matter of law in doing so because "the unborn fetus is not a legal person." Appellant Rep.Br. at 6. The court will not consider an argument raised for the first time in a reply brief. *See, e.g., In re Hunt,* 124 B.R. 200, 210 n. 11 (N.D.Tex. 1991) (Fitzwater, J.).

monthly income [23] and by incorporating speculative future expenses for the Narys' unborn child in calculating Nary's current financial status. It posits that the Narys do not lack education or employment skills, they and their children enjoy good health, and the undisputed facts support the conclusion that Nary's financial condition, although possibly tight at present, can and will improve. The United States suggests that an annual income in the range of $48,000 to $50,000, which could be doubled or more if Mrs. Nary decided to contribute economically to the home finances, is not a minimal standard of living. It contends that the facts on which the bankruptcy court relied do not reveal a circumstance of abject poverty or inability to meet a minimal standard of living.

### B

The bankruptcy court did not clearly err in finding that Nary's monthly expenses exceed his income. The United States bases this argument on the bankruptcy court's finding that the Narys have monthly expenses in the range of $4,150 to $4,300, coupled with testimony that it maintains shows that Nary's 1999 average monthly income was approximately $4,480. *See* Appellant Br. at 7 (citing R. 184–85 and 551). The evidence that the United

States cites for the premise that Nary's average monthly income was approximately $4,480 does not demonstrate clear error. Nary testified concerning his approximate gross monthly income for July through November 1999. He said that July was "probably around" the high $4,000 or $5,000 range, August "could have been around" $5,000, September was "probably more in the [$4,500] range," October was "probably 4,500, something like that," and in November he earned "[a]bout 3,400 gross." R. 184–85. The United States has apparently totaled the highest figures to which he testified, divided that sum by five to derive an approximate monthly income, and extrapolated from that result to reach an average monthly income for the entirety of 1999.[24] It is clear from the record, however, that Nary based his testimony on approximations and that he could not even recall what he had earned in June 1999 or earlier. Moreover, Nary otherwise testified that he probably averaged about $4,000 monthly, sometimes grossing $5,000, and grossing $3,400 in November 1999. He averred that his income was "probably more in the low 4,000 range in any kind of consistent basis, and that's frighten[ing]ly dropped off lately." R. 182; *see* R. 166 ("the gross would probably be ... about 4,000 a month"). He also testified that his income fluctuated and, at the

**23.** The United States asserts in conclusory fashion that when expenses for recreation, church contributions, and monthly transportation for repair of Mrs. Nary's car are removed from reasonable and necessary personal and business expenses, the difference is even greater. *See* Appellant Br. at 7. This contention appears to be advanced to support the argument that the bankruptcy court clearly erred in finding that Nary's expenses exceed his monthly income rather than to posit the separate assertion that the court erred by treating these items as reasonable and necessary personal expenses. If the United States did intend to make this argument, it neither explained nor cited any authorities to support the premise that these expenses are not reasonable and necessary to maintain a minimal standard of living. *See id.* Because the United States must offer a rationale for overturning the bankruptcy court's exercise of its discretion in calculating such expenses, *see In re*

*Brown,* 239 B.R. 204, 208 (S.D.Cal.1999), and since this court will not consider an argument that is inadequately briefed, *see, e.g., Hunt,* 124 B.R. at 210 n. 11, the court declines to address this contention even assuming that the United States intended to raise it. The fact that, after correctly asserting in his brief that the United States had offered no support for its argument that the expenses should be disallowed as unreasonable, Nary defended their reasonableness, *see* Appellee Br. at 8–9, and that the United States addressed Nary's response in its reply brief, *see* Appellant Rep. Br. at 7, does not change this conclusion.

**24.** In the United States' statement of the case, it summarizes Nary's pertinent testimony and states that "[his] average monthly income from the five months preceding the December 6, 1999 hearing was $4,480." Appellant Br. at 5.

time of the adversary hearing, appeared "to be back on more of a downward trend." R. 166.

The bankruptcy court found that Nary had credibly testified that for 1999, he had been averaging approximately $4,000 per month in gross receipts, for total annual income of approximately $48,000 through the date of the adversary hearing. It found that the Narys' reasonable living expenses are in the range of $4,150 to $4,300 per month, which exceeds $4,000. The bankruptcy court did not clearly err in finding that Nary's monthly expenses exceed his income.

■■■ Nor has the United States demonstrated clear error based on its contention that the bankruptcy court erred by incorporating speculative future expenses for the Narys' unborn child in calculating Nary's current financial status. The record reflects that Mrs. Nary was pregnant and expected to give birth in June 2000. She incurred monthly maternity expenses of $180 for physician fees. This expense was part of Nary's current financial status. The bankruptcy court reasoned that the Narys' unborn child should be included in its analysis because any attempted realistic payment of the student loans would necessarily be on a long range basis. The court erred neither legally nor factually in doing so. *See Pena,* 155 F.3d at 1112 (holding that "[a]lthough the *Brunner* test looks to the debtor's 'current' income and expenses, where the evidence suggests that the debtor's income or expenses tend to fluctuate, it is not inappropriate to average figures over a reasonable period of time. To require strict reliance upon conditions existing at the moment of trial could result in an accurate snapshot but a distorted picture.").

■■■ The United States apparently maintains that the bankruptcy court erred in finding that *Brunner's* first element was met because the Narys' education, employment skills, and health, their children's health, their potential for increased income if Mrs. Nary opted to work outside the home, and other evidence shows that they neither live in abject poverty nor are unable to meet a minimal standard of living. The court discerns no basis to reverse the bankruptcy court. The record supports the bankruptcy court's finding that, based on Nary's current income and expenses, he cannot maintain a minimal standard of living for himself and his dependents if forced to repay the loans. Although it is proper to consider the income of a non-borrower spouse in determining whether the first *Brunner* prong has been met, *see, e.g., Commonwealth of Virginia State Educational Assistance Authority v. Dillon,* 189 B.R. 382, 384–85 (W.D.Va.1995), the bankruptcy court did not commit clear error in finding that the Narys' daughter's health, and Nary's inability to care for the child, presently preclude Mrs. Nary from pursuing more than part-time employment. Nor must Nary and his dependents live in abject poverty to obtain relief under § 523(a)(8). *See Hornsby,* 144 F.3d at 438 (holding that debtors "need not live in abject poverty before a discharge is forthcoming"). And because a minimal standard of living includes what is minimally necessary to see that the needs of the debtor and his dependents are met for care, including food, shelter, clothing, and medical treatment, *see In re Rice,* 78 F.3d 1144, 1151 (6th Cir.1996), the bankruptcy court did not commit clear error in finding that the reasonable part of $5,068.00 in claimed expenses total in the range of $4,150 to $4,300 per month, which exceeds the Narys' current income. *See Pena,* 155 F.3d at 1113 (holding that where debtors' average monthly expenses exceeded their net income, "[c]learly, in these circumstances the [debtors] could not maintain a minimal standard of living and pay off the student loans.").

The court affirms the bankruptcy court's finding that Nary met his burden of proof under the first prong of the *Brunner* test.[25]

## V

### A

Under the second component of *Brunner*, Nary was required to establish that additional circumstances exist that indicate that this state of affairs—*i.e.,* the inability to maintain a minimal standard of living based on current income and expenses if forced to repay the student loans—is likely to persist for a significant portion of the repayment period.

Citing *Stebbins–Hopf,* 176 B.R. at 786, and other cases, the bankruptcy court recognized that the second *Brunner* prong obligates the debtor to show that his strained financial condition will continue for a significant portion of the repayment period. *See* R. 554. The court found that Nary's situation will get somewhat worse before it improves due to the decline in his bankruptcy practice caused by economic conditions and his wife's pregnancy and the expected June 2000 childbirth, which further reduces her ability to work outside the home. It predicted that Nary's situation should stabilize somewhat in one year, at a gross monthly family income of $4,500. In view of Nary's law school record, employment history, and chronic mental condition, his income will vacillate in general approximation to this amount. The court found that although a possible positive intangible for the family income is the desire and/or ability of Mrs. Nary to work outside the home, the mental problems of the couple's oldest child appear to restrict this somewhat for a period of time.

The bankruptcy court also held that to consider the full ramifications of § 523(a)(8) and the second *Brunner* element, the availability of a partial discharge must be addressed. The court found that Nary can pay a total of $12,000 on his education loans, plus interest of 9% per annum. It determined that, without precluding Nary from maintaining a minimal standard of living for himself and his family, he can pay $200 per month from August 2000 until the nondischarged indebtedness is paid in full, which "would involve a period of approximately 6½ to 7 years." R. 558. The court found no additional circumstances that suggest a persistent state of affairs under which Nary cannot afford such repayment beyond that period. The court discharged any indebtedness greater than that amount and distributed the nondischarged portion pro rata among SMU, EduCap, TERI, and the Ford Program. It found that no fact or circumstance dictated disparate treatment among the education lenders, and that if specific loan allocation, rather than pro rata distribution of total amounts, were required for discharge, it would be constrained to select arbitrarily loans aggregating the approximate amount of the discharged portion.

The United States appears to challenge the bankruptcy court's analysis of the second *Brunner* element in three separate parts of its brief. It focuses initially on the Ford loan, contending that Nary was obligated to demonstrate (1) the existence of additional extraordinary and non-temporary conditions that will keep his financial condition critical or at least unchanged from its present condition, (2) what the repayment period is for each education loan to be discharged, and (3) that the persistent, negative financial condition will continue during the repayment period. The United States maintains that Nary did not adduce facts that define the repayment period, but that counsel for the United States advised the bankruptcy court, and Nary testified, that he had been accepted into the Income Contingent Repayment Program. It asserts that this would have allowed Nary a period of up to 25 years to repay the Ford loan, at a fixed interest rate of 5.47%. The United States con-

---

25. The United States asserts in its reply brief that Nary failed to establish that a second car was necessary. *See* Appellant Rep.Br. at 8.

Because this argument is first raised in a reply brief, the court will not consider it. *See Hunt,* 124 B.R. at 210 n. 11.

tends that the record lacks evidence that would have permitted the bankruptcy court to find that Nary's situation would not change in the next 25 years, and that the court erred by concluding that Nary had met *Brunner's* second prong without first determining what was the loan repayment period.

Later in its brief, the United States argues that the bankruptcy court erred by failing to make findings regarding any of the education loan repayment periods and to articulate the bases on which it determined that all but $12,000 of the $90,051 in loans would be discharged. Accepting *arguendo* the bankruptcy court's finding that Nary can only pay $200 per month on the loans, the United States posits that the record lacks evidence of extenuating circumstances that support the finding that a 41–year–old person with a remaining work expectancy of at least 20 years should be permitted to extinguish his indebtedness after fewer than seven years.

The United States also contends that the bankruptcy court lacked authority to grant a partial discharge.

### B

The United States' arguments concerning the Narys' ability to repay the Ford loan under the Income Contingent Repayment Plan present no basis for reversal. The evidence shows that DOE offered Nary a payment plan of $401.78 per month for the first year. The bankruptcy court found, without clear error, that Nary could pay only $200 per month toward all his education debt. Therefore, not only was he unable to make the payments required in year one of the program, he could not do so and still maintain a minimal standard of living for himself and his dependents.

### C

 The court is otherwise unable to uphold the bankruptcy court's analysis of the second *Brunner* element. Under this component, Nary must establish that these circumstances "strongly suggest that

[he] will be unable to repay over any extended period of time." *Coveney*, 192 B.R. at 142–43; *see Stebbins–Hopf*, 176 B.R. at 786 (same). The bankruptcy court failed to find expressly the repayment periods or to explain why it capped the nondischarged portion at $12,000 plus interest, a sum that, under the bankruptcy court's calculations, allows a payoff in 6½ to 7 years. The court is therefore unable to decide whether the bankruptcy court clearly erred in holding that Nary satisfied his burden of proof. *See Hornsby*, 144 F.3d at 438 ("The bankruptcy court further did not support the finding that any present inability to pay would persist for a significant portion of the repayment period.").

 "Notwithstanding the considerable deference due the bankruptcy court's fact-finding function, the bankruptcy judge is required to make findings of fact that are sufficiently comprehensive to enable appellate review." *Endrex*, 97 B.R. at 321. "[F]indings of fact must be explicit enough to enable the appellate court to review them." *Id.* at 322. "An appellate court's duty to respect the trial court's factual determination gives rise to a reciprocal one on its part to tell [the appellate court] the reasons for them.'" *Id.* (quoting *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731, 735 (5th Cir.1986)). "Moreover, where the trial court fails to make findings of a fact with respect to critical or material issues in the case, the deficiency precludes the appellate court from reviewing the correctness of the trial court's ultimate decision." *Id.*

Nary argues that the bankruptcy court did determine the student loan repayment periods because it specifically requested from the parties information concerning the amount and length of payment under the Income Contingent Repayment Program and, in reaching its decision, relied on the parties' stipulation. He asserts that the court analyzed and relied on the data regarding the other student loans.

The court disagrees. The bankruptcy court could not have determined the repayment period of the Ford loan—except to use the 25–year plan cap—because, as Nary concedes,[26] no specific repayment had been proposed. Although the materials that the parties submitted to the bankruptcy court as part of government exhibit No. 6 contain considerable loan information, they do not reflect specific payoff dates that the court could have adopted by reference. *Cf.* Appellee Br. at 13 (quoting the bankruptcy court's finding[27] that "By letter of January 12, 2000, Ford Loan and Nary's counsel stipulated to the loans and *their inception dates* that comprised the Ford Loan.") (emphasis added); *id.* at 16 (stating that "[t]he [bankruptcy] Court did a thorough analysis of the Debtor's financial situation, carefully examined each student loan, the date of its inception, the monthly repayment amount, the balance due, and the amount paid thereon[,]" but failing to mention repayment period). Nor do the pages of the bankruptcy court's memorandum opinion that Nary cites contain findings concerning the repayment period for each outstanding student loan. They refer to their inception dates, *see, e.g.,* R. 542 ("By letter of January 12, 2000, Ford Loan and Nary's counsel stipulated to the loans and *their inception dates* that comprised the Ford Loan." (emphasis added)), and, at best, permit inferences to be drawn concerning some but not all repayment periods. *See id.* at 542–44.

Nary also sets out in his brief what he contends, based on other findings in the record, are simple calculations of repayment periods for the SMU, EduCap, and TERI loans. *See* Appellee Br. at 16–17. The bankruptcy court did not perform these calculations, however, and this court is not free to adopt them in the first instance on appeal. Additionally, Nary's computations omit the Ford loan, the outstanding balance of which exceeds the combined total of the other loans.

Even if the bankruptcy court had entered findings concerning the repayment periods, it did not explain why it capped the nondischarged portion of the outstanding loans at $12,000 plus interest, a sum that it found Nary can pay off in 6½ to 7 years, when he will be age 48 or 49. This court could perhaps hold that the bankruptcy court impliedly found, without clear error, that Nary's law school record, employment history, and mental condition are permanent, extraordinary conditions that will severely restrict his earning potential for the balance of his working career. *See Endrex,* 97 B.R. at 323 (holding that "[i]f a trial judge fails to make a specific finding on a particular fact, the reviewing court may assume that the court impliedly made a finding consistent with his general holding so long as the implied finding is supported by the evidence."). Such an implied finding would not address, however, factors such as Nary's capacity to continue paying $200 per month on his education loans for more than 6½ to 7 years, or Mrs. Nary's ability to obtain full-time employment during the repayment period. Regarding Nary's capacity to pay, because "[c]ourts universally require more than temporary financial adversity," *Hornsby,* 144 F.3d at 437, the bankruptcy court must explain why it placed a ceiling on the repayment period that extinguishes the debts after but a fraction of Nary's work life expectancy. Concerning Mrs. Nary, the bankruptcy court found that the mental problems of the couple's oldest daughter "would appear to restrict this [Mrs. Nary's desire and/or ability to work outside the home] somewhat for a period of time." R. 556. The court did not address whether Mrs. Nary will be precluded from earning greater income for a significant

---

26. Nary states that "no length of time for repayment has been offered by the [United States]." Appellee Br. at 12.

27. Nary does not acknowledge that he is quoting the bankruptcy court's memorandum opinion, but a comparison of Appellee Br. at 13 and the court's opinion, R. 542, reflects that he is.

portion of the repayment period (for example, after her children begin attending school full time). Mrs. Nary testified that although it is presently her priority to be at home, she is not opposed to working outside the home.

Accordingly, the court must vacate the judgment and remand for further proceedings.[28]

### D

Because the issue of partial discharge will impact the second *Brunner* element on remand, the court will address it.

While recognizing the split of authority on the question, the United States maintains that § 523(a)(8) does not allow a bankruptcy court to discharge part of an education loan and contends that 11 U.S.C. § 105(a)[29] should not be construed to authorize a partial discharge.

■■■ In *Hornsby* the Sixth Circuit held that § 105(a) empowers a bankruptcy court "to take action short of total discharge." *Hornsby,* 144 F.3d at 438; *see id.* at 440 ("We conclude that, pursuant to its powers codified in § 105(a), the bankruptcy court here may fashion a remedy allowing the [debtors] ultimately to satisfy their obligations to [the creditor] while at the same time providing them some of the benefits that bankruptcy brings in the form of relief from oppressive financial circumstances."). Other courts have adopted a contrary view, concluding that § 523(a)(8) codifies an "all or nothing" approach. *See, e.g., In re Taylor,* 223 B.R.

747, 753 (B.A.P. 9th Cir.1998); Morea, *Student Loan Discharge in Bankruptcy, supra,* at 198 ("the Ninth Circuit leans toward an 'all' or nothing' approach as illustrated in [*Taylor*]." (footnote omitted)). It appears that the Sixth Circuit is the only circuit court to have decided the issue explicitly. And the *Taylor* bankruptcy appellate panel decision has already been rejected by a district court within the Ninth Circuit. *See In re Brown,* 239 B.R. 204, 211–12 (S.D.Cal.1999) (adopting *Hornsby* reasoning). This court declines to create a form of circuit split.[30] It therefore adopts the holding of *Hornsby* that § 105(a) authorizes a bankruptcy court to grant a partial discharge where the undue hardship requirement of § 523(a)(8) is met as to part but not all of a student loan.

Although the United States opposes this conclusion, under the facts of this case, it may result in a recovery that the United States would not otherwise have obtained. Were the bankruptcy court constrained by an "all or nothing" standard, it could find that, without undue hardship, Nary can only pay the outstanding balances of $1,445.00 to SMU, $14,463.97 to EduCap, and $26,643.25 to TERI, but can pay nothing on the Ford loan, which has a $47,000 balance that exceeds the other three debts combined.[31] Elsewhere in this opinion, *see infra* at § VII, the court addresses the United States' separate contention that the bankruptcy court's pro rata allocation of the nondischargeable portions of Nary's

---

**28.** The proceedings on remand may be as limited as entering specific findings in support of the court's conclusion concerning the second *Brunner* element, as broad as reaching a different result on the merits, or somewhere in between.

**29.** 11 U.S.C. § 105(a):
The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any

determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

**30.** A true circuit split, of course, would involve the Fifth Circuit's disagreeing with *Hornsby.*

**31.** *See, e.g., In re Hinkle,* 200 B.R. 690, 694 (Bankr.W.D.Wash.1996) (declining to discharge three loans that debtor could repay without undue hardship, but discharging remaining three loans because repaying them would cause undue hardship).

outstanding debt unfairly penalizes the United States. Yet if the bankruptcy court were unable to grant a partial discharge, the United States could conceivably receive nothing, which is less than the sum of $6,324.00, plus 9% interest per annum, that it realizes under the pro rata allocation. This contingency validates the premise that "[i]t is impossible to consider the dischargeability of any one loan in isolation from the effect of this adversary proceeding upon all of the other loans." *In re Raimondo,* 183 B.R. 677, 680 (Bankr. W.D.N.Y.1995).

The court affirms the bankruptcy court's conclusion that it was legally authorized to enter a partial discharge.

## VI

### A

To satisfy the third *Brunner* element, Nary was obligated to prove that he had made good faith efforts to repay the loans. The bankruptcy court found that Nary had met this prong by paying approximately $33,000 toward retiring his education debts.

The United States asserts that the bankruptcy court erred by failing to examine whether Nary had made payments to each education loan creditor, and that the court's reliance on total payments of $33,000 is clearly erroneous because Nary made no payments on the Ford loan. Nary maintains that he satisfied the good faith requirement by paying $64,165.00 on his student loans, including $5,938.00 on the Hinson–Hazelwood GSL and Hinson–Hazelwood SLS loans that were consolidated into the Ford loan.

### B

■■■■ The bankruptcy court did not clearly err in finding that Nary had satis-

fied *Brunner's* good faith requirement. "[A] lack of payment does not by itself preclude a good faith finding." *Brown,* 239 B.R. at 209. Nary did in fact attempt to pay his indebtedness. He had no education debt before commencing law school. After borrowing to finance his legal education, Nary began paying interest while still a law student. Over a period of four years following completion of law school—until he entered a psychiatric hospital—Nary made $33,000 in payments. Nary borrowed approximately $125,000 to pay for his law school education. He therefore paid off approximately 25% of his education debt before he suffered a mental breakdown.[32] Although he made no payments on the Ford loan itself, he had but a brief opportunity to do so. Nary entered the psychiatric hospital on May 1, 1996, within 90 days of executing the loan on February 14, 1996. Before the Hinson–Hazelwood GSL and Hinson–Hazelwood SLS loans were consolidated into the Ford loan, he paid $5,938.00 toward retiring them.

■■■■ The gravamen of the United States' argument is that Nary did not act in good faith because he made no payments on the Ford loan. The court rejects the legal premise that good faith under *Brunner* must always be assessed in the isolated setting of a single loan. Although the *Brunner* good faith prong does not preclude a bankruptcy court from giving significant or even dispositive weight to how a debtor honors his obligations regarding a particular debt, the court may evaluate the debtor's conduct in the broader context of his total financial picture. Good faith is measured by the debtor's "efforts to obtain employment, maximize income, and minimize expenses." *Roberson,* 999 F.2d at 1136; *see Pena,* 155 F.3d at 1114 (holding that bankruptcy court did

---

32. Because the court recognizes that this calculation may not account for the parts of payments that represent accrued interest rather than principal, it refers to the 25% figure as an approximation, and relies on it as

an illustration of the order of magnitude of Nary's efforts to retire his indebtedness rather than as a precise quantification of those efforts.

not clearly err in finding that debtor had exhibited good faith in paying back student loans where *inter alia* debtor used large sum disability benefits distribution to pay down portions of other debts that were approximately four times amount of student loans).

The bankruptcy court did not clearly err in finding that Nary met his burden of proof under the third component of *Brunner*, and this holding is affirmed.

## VII

### A

The bankruptcy court allocated the $12,000 nondischargeable portion of Nary's education loans pro rata among four creditors. Following the reasoning of *Raimondo*, 183 B.R. at 680, it found no fact or circumstance that would support disparate treatment, and concluded that if specific loan, rather than pro rata, allocation were necessary, it would be required arbitrarily to select loans aggregating the approximate amount that Nary could repay.

 The United States asserts that the bankruptcy court erred by finding there was no evidence to warrant different treatment of the Ford loan and by failing to apply the statutory requirement of undue hardship to each education loan to determine whether Nary had met § 523(a)(8). It contends that a partial discharge of the Ford loan results in unfair and disparate treatment because the United States receives only $6,324.00 (13% of its loan balance) and other lenders recover in the

range of 47% to 67%, because Nary made payments on other loans rather than the Ford loan before taking bankruptcy.[33]

### B

The bankruptcy court did not err in allocating pro rata the nondischargeable portions of the student loans.

 The court did not err as a matter of law because § 523(a)(8) "permits the discharge, on a pro rata basis, of only that portion of the outstanding education indebtedness which exceeds an amount that the debtor can pay without undue hardship." *Raimondo*, 183 B.R. at 681. Although § 523(a)(8) "contains no specific direction regarding the dischargeability of multiple obligations," and does not "provide guidance as to the methodology either for according disparate treatment to multiple obligations (whether to different creditors or as among different loans to the same creditor) ... nothing in the statute expressly precludes such division, particularly when such division is singularly able to placate the commands of equity." *Id.*

 The bankruptcy court did not clearly err in finding that no fact or circumstance warrants disparate treatment of the lenders, and that specific loan allocation would have amounted to no more than an arbitrary exercise in selecting loans that approximate the amount that Nary can afford to repay. The bankruptcy court's determination is also a logical corollary to its good faith finding. Once the court found that Nary had attempted in

---

**33.** Nary maintains that the United States neither raised this issue at the adversary hearing nor in its designation of issues on appeal. He asserts that the other student loan creditors had no notice and opportunity to argue this issue. *See* Appellee Br. at 15. The court disagrees. In his proposed findings of fact and conclusions of law, *see* R. 47, and in the joint pretrial order, *see id.* 53, Nary sought complete discharge of all education debt. The United States was not on notice that it was necessary to oppose a partial discharge, allocated pro rata, until the bankruptcy court issued its ruling. In its designation of issues

on appeal, the United States presented the following issue: "Whether the Bankruptcy Court erred in granting a partial discharge of the education debt?" R. 17. "[T]he purpose of the statement of issues is 'principally to identify the portions of the testimony below that should be included in the record on appeal.'" *In re CPDC Inc.*, 221 F.3d 693, 698 (5th Cir.2000) (quoting Editors' Comment, NORTON BANKRUPTCY RULES PAMPHLET 1999–2000 EDITION 559 (2d ed.1999)). The United States' designation was sufficient to preserve this issue for review.

good faith to pay all his outstanding student loans, it acted consistently by discharging the Ford loan pro rata rather than requiring that Nary pay a greater portion of the outstanding loan balance.

To affirm pro rata allocation, of course, is not to command it. In the present case, as in *Raimondo,* the bankruptcy court found no fact or circumstance to justify disparate treatment among the lenders. *See* R. 558; *Raimondo,* 183 B.R. at 680. On appropriate facts, a bankruptcy court can allocate recoveries to multiple creditors using other fair and equitable methodologies.

Because the bankruptcy court did not err legally or clearly err in its factual findings, its determination that the creditors should recover pro rata is affirmed.

\* \* \* \* \* \*

Accordingly, the court AFFIRMS in part and VACATES in part the bankruptcy court's judgment and REMANDS this matter for further proceedings consistent with this opinion.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.