In re Jerald Martin BARRON
and Lynda Marie Barron,
Debtors.

Jerald Martin Barron and Lynda
Marie Barron, Plaintiffs,

v.

Texas Guaranteed Student Loan Corporation, United States Dept. of Education, and Northeast Louisiana University, Defendants.

Bankruptcy No. 00–60456.
Adversary No. 00–6041.

United States Bankruptcy Court,
E.D. Texas,
Tyler Division.

July 2, 2001.

835

Trey Yarbrough, Tyler, TX, for Plaintiffs.

Doug Ray, Austin, TX, for Defendant.

### *MEMORANDUM OF DECISION*

BILL G. PARKER, Bankruptcy Judge.

This matter came before the Court for trial of the Complaint of the Debtor–Plaintiff, Lynda Marie (Jett) Barron ("Debtor" or "Plaintiff"), through which she seeks a discharge of a student loan obligation to the Texas Guaranteed Student Loan Corporation under the "undue hardship" exception of 11 U.S.C. § 523(a)(8). At the conclusion of the trial, the Court took the matter under advisement. This memorandum of decision disposes of all issues pending before the Court.[1]

---

1. This Court has jurisdiction to consider the complaint pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). The Court has the authority to enter a final judgment in this adver-

## Factual And Procedural Background

The facts in this case are not seriously disputed. From 1981 through 1983, as a married student at the University of Texas at Arlington, the Plaintiff, Lynda Marie Barron ("Debtor"), secured four student loans totaling $8,000.00 (the "student loans") which were guaranteed by the Defendant, the Texas Guaranteed Student Loan Corporation ("TGSLC").[2] Under the loan agreements, the Debtor agreed to repay these loans in periodic installments to begin no later than nine months after she either left school or ceased carrying at least one-half of a normal academic workload at a school participating in the Guaranteed Student Loan Program. The repayment period was to begin in September, 1985, triggered by the Debtor's graduation in December, 1984 at which time she was awarded a bachelor's degree in journalism.

In 1985, however, the Debtor's ability to begin the repayments was immediately stymied when the Debtor's husband, Dr. A.D. Jett, Jr., was diagnosed with Alzheimer's disease. The diagnosis forced the retirement of Dr. Jett from his employment as a professor at UT Arlington and slowly devastated the financial stability of the family. As Dr. Jett suffered through the progressively debilitating stages of the disease, eventually ending in his death in November, 1991, the health-care costs depleted the family's savings and effectively prevented the Debtor from making any payments on her student loan obligations.

Following her first husband's death, the Debtor contacted the student loan agencies and then subsequently various governmental representatives in an effort to obtain a repayment plan on her ever-increasing student loan balances which she could financially perform. In a repayment plan partially brokered through the office of then-Sen. Lloyd Bentsen, the Debtor began in 1992 to make payments of $25.00 per month on the TGSLC loans.[3] However, such a small payment amount failed to cover even the accruing interest and certainly had no effect upon the principal balance of the loans.

In 1992, the Debtor moved to Tyler after obtaining full-time employment as a news editor with a Tyler newspaper for approximately $375 per week. Although the position was commensurate with her educational training, the salary barely afforded the Debtor the means by which to meet minimal monthly living expenses. She did manage to purchase with owner financing a small A-frame house at Hideaway Lake which required only a small monthly mortgage payment. She also continued to tender the small monthly payments on her student loans under the so-called "Bentsen" plan. While the Debtor during this time period continued to make inquiries about other employment opportunities, including contacts with newspapers

sary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I) and (O).

2. The Plaintiff also owes two other student loan obligations. Her student loan from Northeast Louisiana University in the amount of $441.13, plus interest and attorney's fees, will be declared dischargeable in this adversary proceeding as a result of the default entered against that university in this proceeding prior to trial. However, her student loan obligation to the United States Department of Education in the approximate amount of $4,500.00 cannot be affected by the complaint in this proceeding since that creditor was never properly served.

3. Under the "Bentsen" plan, the Debtor paid $60.00 monthly on her student loan obligations—$25.00 to the TGSLC, $25.00 to the U.S. Department of Education, and $10.00 to Northeast Louisiana University.

in Dallas, Austin, Corpus Christi, and Graham, she found no position available through which a greater income could have been realized.

In February, 1994, the Debtor married a truck driver named Larry Hill. Their three-year marriage relationship was stormy and resulted in greater economic problems for the Debtor. Mr. Hill had a gambling problem which led to credit card abuse. The Debtor was unaware of these developing problems since her husband exercised absolute control over the family pocketbook. As a result, the couple incurred substantial debt and the Debtor claims to have suffered both physical and emotional abuse at the hands of Mr. Hill.[4] During the marriage, the Debtor's A-frame house was sold and the sale proceeds were ultimately funneled into Mr. Hill's home which the couple shared. Upon their divorce in 1998, Mr. Hill was awarded sole possession of that home without any reimbursement to the Debtor and the Debtor testified without contradiction that all she really received at the time of the divorce were her clothes and personal belongings.

Few, if any, payments were made on the student loans during the Debtor's marriage to Mr. Hill. Because there had been no meaningful action toward the reduction of the Debtor's student loan obligations over a number of years, the TGSLC in 1997 initiated litigation against the Debtor in Cause No. 225,604 in the County Court at Law No. 2 of Travis County, Texas. On September 18, 1997, TGSLC secured a judgment against the Debtor for the student loan indebtedness in the amount of $16,782.23 (the "Travis County judgment"). The parties agree that, as a result of the Travis County judgment against Plaintiff and the subsequent accrual of interest, the Debtor is currently indebted to the TGSLC in the sum of $20,881.18, with interest accruing on that amount at the rate of 7 percent per annum or $3.22 per day.

In January, 1999, after her divorce from Mr. Hill and a short employment stint with KETK–TV in Tyler, the Debtor obtained employment as a legal assistant in the Law Offices of A.D. Clark for a gross monthly salary of $1,700.00. In May, 1999, the Debtor accepted employment as a legal assistant with the Law Offices of Trey Yarbrough at a beginning gross monthly salary of $1,950.00. She remains employed as a legal assistant with the Yarbrough law office to this date, but now also supervises the firm's time entries and internal bookkeeping operations, duties which require longer hours and preclude her from obtaining supplementary employment. Her gross monthly salary is now $2,500.00, with net take-home pay of $2,014.00.

In late 1999, in an effort to collect the Travis County judgment, the TGSLC notified the Debtor that, unless she established a written repayment agreement on or before February 12, 2000, the TGSLC would begin the process of garnishing her wages pursuant to the provisions of 20 U.S.C. § 1095(a).[5] Prior to the time that

---

4. These facts were corroborated by the testimony of James A. Johnson.

5. Though creditors are generally prohibited under Texas law from seeking wage garnishments except under very limited circumstances, the Higher Education Act of 1965, as amended in 1991 and 1998, and as codified in 20 U.S.C. §§ 1095a, provides that a federal guaranty agency can involuntarily garnish up to ten percent of a student loan debtor's disposable wages. This garnishment procedure expressly preempts any state law protections which would otherwise prevent such garnishments. *See, e.g., Nelson v. Diversified Collection Svcs., Inc.,* 961 F.Supp. 863, 872 (D.Md. 1997).

the wage garnishment process could be completed and implemented, the Debtor, along with her current husband, Jerald M. Barron, filed a joint voluntary petition for relief under Chapter 7 of the Bankruptcy Code on March 15, 2000.

■ The current monthly take-home pay for the Debtor and her husband is $3,064.00.[6] The following is a listing of their current monthly expenses:

| | |
|---|---|
| Rent | $ 815.00 |
| Phone | $ 90.00 |
| Utilities | $ 125.00 |
| Cable TV | $ 60.00 |
| Truck Payment | $ 260.00 |
| Auto Payment | $ 316.00 |
| Auto Insurance | $ 105.00 |
| Renter's Insurance | $ 25.00 |
| Food/Toiletries | $ 500.00 |
| IRS | $ 100.00 [7] |
| Medical Expenses: | |
| Drug Co–Pays | $ 125.00 |
| Medical Co–Pays | $ 100.00 |
| Lab Co–Pays | $ 60.00 |
| Post-petition Doctor Bills | $ 25.00 |
| Gas/Auto Maint./Repair | $ 200.00 |
| Haircuts/Miscellaneous | $ 100.00 |
| Clothing (if funds avail) | $ 20.00 |
| Dry Cleaning (if funds avail) | $ 20.00 |
| | $3,046.00 |

The Debtor testified that, notwithstanding the budgetary numbers, she and her husband endure a monthly struggle to make their financial ends meet. Mr. Barron suffers from serious medical problems which require continuous monitoring and treatment, as well as significant monthly drug expenses. The Debtor is also required to incur monthly drug expenditures.

These monthly medical expenses are subject to substantial variation and cannot be accurately predicted. However, they obviously must be paid by the Debtor as they are incurred, even though such payments may significantly reduce the amount of discretionary funds available in any particular month.[8] On occasion, the Debtor has been forced to seek salary advances from her employer in order to pay such unanticipated drug expenses.

It is under these financial circumstances that the Debtor brings the present complaint seeking to discharge her student loan indebtedness to the TGSLC under the "undue hardship" provisions of 11 U.S.C. § 523(a)(8).

### Discussion

#### Undue Hardship Test

■ § 523(a)(8) of the Bankruptcy Code excepts from an individual's discharge "a loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit ... unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." This exception to discharge "was enacted to prevent indebted college or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans."

---

**6.** Mr. Barron earns monthly take-home pay of $1,050.00 from his employment as a security guard. "It is now well-settled that § 523(a)(8) of the Code requires bankruptcy courts to consider the income of a non-debtor spouse when deciding whether, in the court's discretion, excepting a debtor's student loans from discharge will impose an 'undue hardship' on the debtor." *Dolan v. American Student Assistance (In re Dolan)*, 256 B.R. 230, 236 (Bankr.D.Mass.2000). *See also, Nary v. The Complete Source (In re Nary)*, 253 B.R. 752, 763 (N.D.Tex.2000); *Greco v. Sallie Mae Servicing Corp. (In re Greco)*, 251 B.R. 670, 676–77 (Bankr.E.D.Pa.2000); *White v. United*

*States Dept. of Education (In re White)*, 243 B.R. 498, 509, n. 9 (Bankr.N.D.Ala.1999) and cases therein.

**7.** This expense addresses a non-dischargeable tax obligation of the Debtors which will likely be satisfied at the end of 2001.

**8.** While listing monthly medical expenses of $285.00 in the budget, the Debtor testified that the actual co-pay expenses for doctors and drugs were $458.47 in December, 2000 and $539.37 in January, 2001.

*In re Hornsby,* 144 F.3d 433, 436–37 (6th Cir.1998). It also protects the continued financial viability of educational loan programs. As the Second Circuit recently observed,

> ... because student loans are generally unsecured and recent graduates often have few or no assets, these debtors have an incentive to try to discharge their educational loans in bankruptcy. If successful, they can then enjoy the higher earning power the loans have made possible without the financial burden that repayment entails. Congress enacted § 523(a)(8) because there was evidence of an increasing abuse of the bankruptcy process that threatened the viability of educational loan programs and harm to future students as well as taxpayers. Congress recognized that this is an instance where a creditor's interest in receiving full payment of the debt outweighs the debtor's interest in a fresh start.

*Cazenovia College v. Renshaw (In re Renshaw),* 222 F.3d 82, 86–87 (2d Cir.2000) (citations omitted).

 However, as the statutory text suggests, a discharge of a student loan is possible if a debtor can demonstrate, by a preponderance of the evidence, that to hold the student loan nondischargeable would impose an "undue hardship" upon her and her dependents. Surprisingly, there is no precise definition of the term "undue hardship." It is not defined in the Bankruptcy Code nor has any particular judicial definition been endorsed by any decision of the United States Supreme Court or the Fifth Circuit Court of Appeals. *Kettler v. Great Lakes Higher Educ. Serv. Corp. (In re Kettler),* 256 B.R. 719, 722 (Bankr.S.D.Tex.2000). However, as courts have attempted to balance a debtor's need for a fresh start with the recognized need to protect student loan programs and their participants, a growing consensus has emerged regarding the evidentiary foundation necessary to establish an undue hardship. Most courts have endorsed a three-prong test articulated by the Second Circuit Court of Appeals in *Brunner v. New York State Higher Educ. Serv. Corp.,* 831 F.2d 395 (2d Cir.1987) under which a debtor is required to show:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loan;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and

(3) that the debtor has made good faith efforts to repay the loan.

*Id.* at 396. This test has been essentially adopted by the Third Circuit,[9] the Sixth Circuit,[10] the Seventh Circuit,[11] and the Ninth Circuit.[12] While the Eighth Circuit

---

**9.** *Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish),* 72 F.3d 298, 306 (3d Cir.1995), *cert. denied,* 518 U.S. 1009, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996).

**10.** *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman),* 25 F.3d 356, 359 (6th Cir.1994), *cert. denied,* 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995). Actually, while the Sixth Circuit in *Cheesman* did not expressly adopt *Brunner* in its finding that the student loans in question "were dischargeable under any undue hardship test the [bankruptcy] court may have used," it undoubtedly applied the *Brunner* factors in affirming the bankruptcy court's decision.

**11.** *Matter of Roberson,* 999 F.2d 1132, 1135 (7th Cir.1993).

**12.** *United Student Aid Funds, Inc. v. Pena (In re Pena),* 155 F.3d 1108, 1111–12 (9th Cir.1998). In reviewing the various circuit decisions and rejecting the reading of the

purports to apply its own independent "totality of the circumstances" test,[13] the Eighth Circuit test requires an examination of the same factors articulated by *Brunner*, including the debtor's current and future financial resources, the reasonableness of the debtor's living expenditures, and any other relevant facts or circumstances.[14] Many courts within the Fifth Circuit have also utilized the *Brunner* analysis.[15] In recognition of the general consensus in this area, this Court will review the Debtor's evidentiary presentation in light of the *Brunner* factors in order to determine whether she has met her burden to demonstrate the existence of an undue hardship.

■■■ Under the first *Brunner* element, the Debtor is required to show that she cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if she is forced to repay the student loan. This analysis is actually a two-step process encompassing: (1) the evaluation of the debtor's present standard of living based upon her lifestyle attributes which appear from the record and (2) whether the forced repayment of the student loan obligation will preclude the debtor from maintaining a minimal standard of living. *Naranjo v.*

*Educational Credit Mgmt. Corp. (In re Naranjo)*, 261 B.R. 248, 254–55 (Bankr. E.D.Cal.2001). The test requires "more than a showing of tight finances, and is not met 'merely because repayment of the borrowed funds would require some major personal and financial sacrifices.'" *Elmore v. Mass. Higher Educ. Assistance Corp. (In re Elmore)*, 230 B.R. 22, 26 (Bankr.D.Conn.1999), citing *Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir. 1995), *cert. denied*, 518 U.S. 1009, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996). However, the test does not require a debtor to demonstrate that repayment of the loan would cause her and her family to live at or below poverty level. *Lebovits v. Chase Manhattan Bank (In re Lebovits)*, 223 B.R. 265, 271 (Bankr.E.D.N.Y.1998).

Notwithstanding the mere $18.00 difference between the projected income and expenses of the Debtor's family and the substantial fluctuation which has occurred in their monthly medical expenses, there is still a degree of discretionary spending reflected in the budget projections of the Debtor and her spouse. The annual take-home pay of the Debtor and her spouse exceeds $36,000.00 and, while their spending cannot be described as extravagant,

bankruptcy appellate panel below, the Ninth Circuit in *Pena* also observed that, notwithstanding the slightly different language, "[i]t does not appear that the Sixth Circuit in *Cheesman* was a proclaiming a test distinct from *Brunner*."

13. *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702 (8th Cir.1981).

14. *Cline v. Illinois Student Loan Assistance Assoc.(In re Cline)*, 248 B.R. 347, 349 (8th Cir. BAP 2000) ["In the Eighth Circuit, the test for undue hardship is the totality of the circumstances, with particular attention to the debtor's current and future financial resources, necessary reasonable living expenses for the

debtor and the debtor's dependents, and any other facts unique to the particular bankruptcy case."].

15. *Nary v. The Complete Source (In re Nary)*, 253 B.R. 752, 761 (N.D.Tex.2000) (Fitzwater, D.J.); *Educ. Credit Mgmt. Corp. v. McLeroy (In re McLeroy)*, 250 B.R. 872, 878 (N.D.Tex. 2000) (Cummings, D.J.); *Kettler v. Great Lakes Higher Educ. Serv. Corp. (In re Kettler)*, 256 B.R. 719, 722 (Bankr.S.D.Tex.2000) (Greendyke, Bankr. J.); *Coveney v. Costep Servicing Agent (In re Coveney)*, 192 B.R. 140, 141 (Bankr.W.D.Tex.1996) (King, Bankr. J.); *Raisor v. Educ. Loan Servicing Center, Inc. (In re Raisor)*, 180 B.R. 163, 166 (Bankr.E.D.Tex. 1995) (Abel, Bankr. J.)

neither can it be described as "minimal." They pay $815.00 per month to live in a two-bedroom apartment for the admitted primary purpose of accommodating each other's snoring. They enjoy a healthy monthly allotment for food, telephone, including cellular telephone service, as well as a significant monthly cable television expense. Normally the existence of such discretionary income would compel the conclusion that the Debtor could maintain a minimal standard of living, even if forced to remit monthly payments on a student loan obligation. However, another factual circumstance precludes that result, notwithstanding the existence of nominal amounts of discretionary income.

■ Because the Defendant secured the Travis County judgment against the Plaintiff in September, 1997 for an amount, composed primarily of interest and attorney's fees, which the parties have agreed has grown to a sum of almost $21,000.00, the term "forced to repay" takes on an entirely new meaning. Because of the entry of the judgment, this debt is no longer subject to a scheduled repayment plan and, if this debt remains non-dischargeable, the Defendant can immediately bring to bear upon this Plaintiff the entire panoply of execution remedies available under Texas law for the collection of that judgment amount, with virtually no defense available to the Debtor to preclude any such action.[16] Even assuming a downward adjustment by the Debtor of her projected budgetary amounts and the hypothetical cessation or reduction of monthly medical expenses, this Court must conclude that this Debtor, if forced to repay this student loan under the constant threat of comprehensive collection activities to realize the entire unpaid amount, could not maintain a

minimal standard of living. The best assurances of the Defendant, as offered in open court, that it would not subject the Debtor to immediate demands for the full satisfaction of the judgment does not alter the fact that such avenues would remain in the quiver of remedies available to the Defendant in the collection of this debt under such circumstances and that, following the entry of judgment in this case, there would exist no barrier to the Defendant's exercise of those rights at any future time.

■ The existence of the judgment also affects consideration of the second *Brunner* factor—that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan. This second prong considers the likelihood that the debtor's financial situation will improve sufficiently in the future to permit her to resume the payment of her educational loans, *United States Dept. of Education v. Wallace (In re Wallace)*, 259 B.R. 170, 181 (C.D.Cal.2000) and is "intended to effect the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt." *United Student Aid Funds, Inc. v. Nascimento (In re Nascimento)*, 241 B.R. 440, 445 (9th Cir. BAP 1999). This factor "more reliably guarantees that the hardship presented is 'undue.'" *In re Elmore*, 230 B.R. at 27, citing *Brunner*, 831 F.2d at 396.

Because of the entry of the Travis County judgment, there is no longer any repayment period for this loan. That judgment may remain valid against the Debtor for the remainder of her life, pursuant to the Defendant's exercise of the rather simple

---

**16.** See generally, TEX. CIV. PRAC & REM.CODE ANN. § 34.001, et. seq. (Vernon 1997) and TEX.R. CIV. P. 621–656.

state law procedures regarding the dormancy and revival of judgments.[17] Thus, regardless of whether any future improvement in the Debtor's financial affairs may be anticipated as a result of the entry of a discharge order, the fact that this judgment will otherwise remain pending against the Debtor in the post-discharge period, with all post-judgment collection remedies available to the Defendant until such time as the judgment is fully and completely satisfied, leads this Court to conclude that the Debtor has satisfactorily demonstrated the existence of additional circumstances under which the undue hardship of requiring the payment of this debt to the Defendant in such an "all or nothing" mode will persist throughout the foreseeable future.

 Finally, the third inquiry under the *Brunner* test is whether the debtor has made a good faith effort to repay her student loan. This aspect recognizes that undue hardship "encompasses a notion that the debtor may not wilfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Stein v. Bank of New England (In re Stein)*, 218 B.R. 281, 288 (Bankr.D.Conn. 1998), citing *Matter of Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993). "Moreover, upon receiving the taxpayer-guaranteed loan and consequent educational benefit, a debtor assumes an obligation to make a good faith attempt at full repayment as 'measured by his or her efforts to obtain employment, maximize income and minimize expenses,' *Id.*, and to undertake all other reasonable efforts to insure repayment." *In re Elmore*, 230 B.R. at 27,

citing *Brunner*, 831 F.2d at 397. "Factors to be considered include the number of payments the debtor made, attempts to negotiate with the lender, proportion of loans to total debt, and possible abuse of the bankruptcy system." *In re Wallace*, 259 B.R. at 185.

As acknowledged by the Defendant at trial, the Debtor has made a good faith effort over the past twenty years to pay her student loan obligations. The Debtor has endured innumerable personal problems and tragedies during that span of time. She has made numerous attempts to improve her employment status and unsuccessfully tried to implement a reduced payment plan when income was insufficient to service the debt under its terms. The Defendant even admitted at trial that there is "not a lot of fat" in the Debtor's ongoing monthly expenses. Accordingly, the Court finds that the third element of the *Brunner* test has been satisfied by the Debtor.

Obviously the critical element in the Court's evaluation of the Debtor's circumstances in this case has been the acceleration of the student loan indebtedness and the existence of the state court judgment against her. Were it not for the fact that, if this obligation is not discharged, the Debtor faces a continuing effort by the Defendant to collect the full judgment amount through the utilization of whatever collection remedies that state law affords, the finding of an undue hardship under the Debtor's present financial circumstances would become increasingly problematic. The Debtor and her spouse enjoy take-home pay in excess of $36,000.00 per year.

---

17. Texas law provides that if a writ of execution is not issued within ten years after the rendition of the judgment or within ten years of the issuance of a writ of execution, the judgment becomes dormant and must be revived prior to any execution upon it. TEX. CIV. PRAC. & REM CODE ANN. § 34.001 (Vernon 1997). A dormant judgment may be revived by scire facias or by an action of debt brought on or before the second anniversary of the date that the judgment became dormant. TEX. CIV. PRAC. & REM.CODE ANN. § 31.006 (Vernon 1997).

The Debtor has stable employment with a reputable law firm and there is nothing in the record to suggest that the Debtor will suffer any disruption in that employment relationship in the foreseeable future. Thus, if the repayment of the obligation could be restructured in terms of amount and duration, then such repayments could likely be tendered by the Debtor and the policy objectives undergirding the general non-dischargeability of student loans could be sustained, at least in part, without the imposition of an undue hardship upon the Debtor.

■ The relevant question is whether this Court has the power to impose such a restructuring so as to require the Debtor to fulfill at least a partial repayment of the student loan obligation, while providing the Debtor a discharge of the remaining amounts. Some courts have disputed the ability of a bankruptcy court to utilize its equitable powers to partially discharge a debtor's student loan and assert that the determination of the dischargeability of a student loan obligation is an all-or-nothing proposition. *See, e.g., Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 129–37 (8th Cir. BAP 1999)[which, after spending almost nine pages rebuking the courts which had issued partial discharges of student loan obligations, surprisingly recalled that "that

question is not before us and we therefore decline to decide it."][18]; *United Student Aid Funds, Inc. v. Taylor (In re Taylor)*, 223 B.R. 747, 753 (9th Cir. BAP 1998); *Mallinckrodt v. Chemical Bank (In re Mallinckrodt)*, 260 B.R. 892, 904 (Bankr. S.D.Fla.2001)["To authorize partial discharges is tantamount to judicial legislation and is something that should be left to Congress, not the courts."]; and *Brown v. Union Financial Services, Inc. (In re Brown)*, 249 B.R. 525 (Bankr.W.D.Mo. 2000). Other courts have concluded that it is, in fact, appropriate for a bankruptcy court to utilize its equitable powers as codified in § 105(a) of the Code to issue only a partial discharge of a debtor's student loan obligations under appropriate circumstances in order to balance the restructuring of the particular debtor-creditor relationship in that case.[19] *See, e.g., Great Lakes Higher Education Corporation v. Brown (In re Brown)*, 239 B.R. 204, 210–12 (S.D.Cal.1999); *Rivers v. United Student Aid Funds, Inc. (In re Rivers)*, 213 B.R. 616, 618 (Bankr.S.D.Ga.1997); *Heckathorn v. United States (In re Heckathorn)*, 199 B.R. 188, 195–96 (Bankr. N.D.Okla.1996); *Wetzel v. New York State Higher Educ. Servs. Corp. (In re Wetzel)*, 213 B.R. 220, 226–27 (Bankr.N.D.N.Y. 1996); *Fox v. Student Loan Mktg. Ass'n*

---

**18.** However, the *Andresen* court did endorse the practice of protecting a selected student loan from discharge while discharging another similarly-situated student loan under the undue hardship standard when there was no apparent factual or statutory means to differentiate between them. While one might legitimately debate the relative merits of the "singularity" statutory analysis adopted by *Andresen*, 232 B.R. at 136, as opposed to the "equal protection" arguments espoused in cases such as *Raimondo v. New York State Higher Educ. Servs. Corp. (In re Raimondo)*, 183 B.R. 677, 681 (Bankr.W.D.N.Y.1995), the *Andresen* court's scathing criticism about "arbitrary or unpredictable results" arising from

the use of § 105(a) to grant a partial discharge of student loans seems sanctimonious and misdirected.

**19.** 11 U.S.C. § 105(a) provides that:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

*(SLMA) (In re Fox),* 189 B.R. 115, 117 (Bankr.N.D.Ohio 1995).

The debate in this area simply mirrors the growing dispute over the use of § 105(a) powers by a bankruptcy court under any circumstance. This dispute appears to have arisen as a backlash against earlier decisions in which § 105(a) was utilized in a decidedly improper, one-sided manner in order to grant relief far outside the realm of that contemplated by the Bankruptcy Code based upon the debtor's plea for the court to "do equity."[20] Certainly a correction of those abuses has been necessary and appropriate. However, the pendulum is swinging beyond the point of mere emendation. Regretfully, the term "equity" is becoming so odious that we dare not speak its name and § 105(a) is rapidly becoming the pariah of the Bankruptcy Code.

 While a bankruptcy court must always exercise due caution to insure that its equitable powers are being exercised even-handedly and in a manner consistent with the provisions of the Bankruptcy Code, *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 969,

99 L.Ed.2d 169 (1988),[21] the scope of that restriction should not be exaggerated to the point at which bankruptcy courts feel powerless to act unless a party can present a specific textual quotation which precisely identifies the availability of a specific remedy. § 105(a) specifically "authorizes a bankruptcy court to fashion such orders as are necessary to further the purposes of the substantive provisions of the Bankruptcy Code," *United States v. Sutton,* 786 F.2d 1305, 1307 (5th Cir.1986). It is interpreted liberally, *Matter of Zale Corp.,* 62 F.3d 746, 760 (5th Cir.1995), and, while that certainly "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity," *Sutton,* 786 F.2d at 1308, neither can an approach be justified which effectively writes § 105(a) out of the Code.

Bankruptcy remedies are rooted in equity in recognition of the fact that a fair and proper restructuring of a debtor-creditor relationship occasionally creates a need for flexibility within the statutory parameters and objectives of the Bankruptcy Code.[22]

---

20. In the interests of full disclosure, this particular observer must confess that such a cry may have escaped his lips on occasion in his past life when he found himself, in the words of James Taylor, "moving in quiet desperation." James Taylor, *Walking Man, on* WALKING MAN (Warner Bros. Records 1974).

21. *See also, In re Dow Corning Corp.,* 244 B.R. 721, 742 (Bankr.E.D.Mich.1999), aff'd in part and rev'd in part, 255 B.R. 445 (E.D.Mich. 2000) ["It is clear from the text of § 105(a), however, that a court's authority thereunder must derive from whatever (other) Code provision the § 105(a) order is designed to 'carry out.' "]; *In re Appletree Markets Inc.,* 139 B.R. 417, 421 (Bankr.S.D.Tex.1992) [finding that "substantive relief must be available under the Bankruptcy Code before the equitable powers may be utilized"].

22. This flexibility does not damage the law. The maxim remains true: "equity follows the law" and courts are compelled to invoke equitable solutions only under settled and definite principles. But law and equity are complementing companions as Lord Cowper observed in the 1705 English decision of *Dudley v. Dudley:*

> Now equity is no part of the law, but a moral virtue, which qualifies, moderates, and reforms the rigour, hardness, and edge of the law, and is an universal truth; it does also assist the law where it is defective and weak in the constitution (which is the life of the law) and defends the law from crafty evasions, delusions, and new subtleties invented and contrived to evade and delude the common law, whereby such as have undoubted right are made remediless and this is the office of equity, to support and protect the common law from shifty and

Thus, in the opinion of this Court, the better-reasoned approach acknowledges the power of a bankruptcy court to utilize its equitable powers as codified in § 105(a) to fashion a remedy which is appropriate under the circumstances to restructure the particular relationship between a debtor and a student-loan creditor. The greater weight of authority supports this position, including recent opinions from two circuit courts of appeal.

In *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433 (6th Cir.1998), the Sixth Circuit, in reversing and remanding a bankruptcy court's decision to grant a debtor a total discharge of student loan obligations, determined that it was appropriate for a bankruptcy court to use § 105(a) in order to grant a partial discharge of student loan obligations.[23] It stated that

> ... we believe that [the bankruptcy court] had the power to take action short of total discharge. We find this authority in 11 U.S.C. § 105(a), which permits the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," so long as such action is consistent with the Bankruptcy Act [sic]. See *Securities and Exchange Comm'n v. United States Realty & Improvement Co.*, 310 U.S. 434, 455, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940) ("A bankruptcy court is a court of equity and is guided by equitable doctrines and principles except in so far as they are inconsistent with the Act." (citations omitted)). In a student-loan discharge

case where undue hardship does not exist, but where facts and circumstances require intervention in the financial burden on the debtor, an all-or-nothing treatment thwarts the purpose of the Bankruptcy Act [sic].

*Id.* at 438–39. Thus, following a review of jurisprudence demonstrating the ability of courts to craft various remedies under § 105(a) in student loan dischargeability cases which balanced the rights of student loan creditors and debtors in light of the circumstances of a particular case, and based upon the bankruptcy court's observation that a repayment of the entire debt in the case would impose an undue hardship on the debtor, but a partial repayment would not, the Sixth Circuit ultimately concluded that:

> ....pursuant to the powers codified in § 105(a), the bankruptcy court here may fashion a remedy allowing the Hornsbys ultimately to satisfy their obligations to TSAC while at the same time providing them some of the benefits that bankruptcy brings in the form of relief from oppressive financial circumstances.

*Id.* at 440.

The Ninth Circuit Court of Appeals has subsequently endorsed the *Hornsby* reasoning. In *Graves v. Myrvang (In re Myrvang)*, 232 F.3d 1116 (9th Cir.2000), the Ninth Circuit reviewed the Sixth Circuit's § 105(a) analysis and found that it "applies with equal force to dischargeability proceedings under § 523(a)(15)." *Id.* at 1123–24. In confirming the ability of a

---

crafty contrivances against the justice of the law. Equity therefore does not destroy the law, nor create it, but assist it.
*National Provincial Bank Ltd. v. Ainsworth*, [1965] A.C. 1175, 1198–99, 3 W.L.R. 1, 2 All E.R. 472, 109 Sol. J. 415 (H.L.1965).

**23.** The Sixth Circuit had previously endorsed a bankruptcy court's use of § 105(a) to delay

for a period of eighteen months a final dischargeability determination in a student loan case in order that the existence of an undue hardship might be reassessed. *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 359 (6th Cir.1994), *cert. denied*, 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995).

bankruptcy court to use § 105(a) as a foundation for issuing a partial discharge of a debt arising from a divorce decree, the Ninth Circuit rejected the analysis of its own bankruptcy appellate panel in *Taylor* and specifically agreed with its sister circuit that a rejection of the bankruptcy court's discretion to use § 105(a) to direct a partial discharge of debt in deference to an all-or-nothing standard "thwarts the purpose" of the Bankruptcy Code. *Id.* at 1123. This rationale has been adopted by other courts as well. *See, e.g., Saxman v. United States Dept. of Education (In re Saxman)*, 263 B.R. 342, 344–45 (W.D.Wash.2001) [finding that bankruptcy judges may partially discharge education loans if only a portion of the loan would result in undue hardship, applying *Myrvang]; Nary v. The Complete Source (In re Nary)*, 253 B.R. 752, 767 (N.D.Tex.2000) ["... § 105(a) authorizes a bankruptcy court to grant a partial discharge where the undue hardship requirement of § 523(a)(8) is met as to part but not all of a student loan."]; *Kapinos v. Graduate Loan Center (In re Kapinos)*, 243 B.R. 271, 276–77 (W.D.Va.2000) [finding that the use of § 105(a) to grant a partial discharge is "consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships" and that it could identify "no policy rationale for ignoring the flexibility of § 105 and requiring an all-or-nothing approach to § 523(a)(8)."]; *but cf. Miller v. United States Dept. of Education (In re Miller)*, 254 B.R. 200, 206 (Bankr.N.D.Ohio 2000) [finding, in the application of the equitable maxim of "one who seeks equity must do equity," that every debtor who seeks bankruptcy relief is not necessarily entitled to receive a partial discharge or a change in terms of their student loan obligations and that a court should look at factors such as

(1) whether the debtor has made any payments on the student loan obligations; (2) whether the debtor obtained any tangible benefit(s) from their student loan obligation; (3) whether the debtor is using their best efforts to maximize their financial potential; and (4) whether the debtor's troubled financial circumstances resulted from events not realistically within the debtor's control.]. While this approach could result in a "lack of certainty and a diversity of results," [24] the dissimilarities are not the product of unequal justice, or an improper application of law, but rather they arise from the fact that each debtor has his own unique set of financial circumstances and any proper adjustment of the debtor-creditor relationship must necessarily recognize and consider those distinctions.

■■■ The unique circumstances of this case justify this Court's use of § 105(a) to grant to the Debtor only a partial discharge of her student loan obligation to the Defendant. It is clear that the Debtor cannot maintain a minimal standard of living while existing under the ever-present threat of the collection of an outstanding (and growing) judgment debt; nor is she capable of repaying the entire amount, even if amortized over an extended time period. Her spouse's income stream is tenuous due to his failing health. The Debtor is likely to remain employed only for another fifteen years or so and cannot reasonably expect more than occasional and moderate income adjustments. The couple have continuing tax problems and other outstanding post-petition obligations, in addition to the anticipated future medical expenses.

However, the Debtor is capable of addressing at least a portion of the debt if the obligation can be restructured to provide a reasonable monthly payment over a

**24.** *Andresen,* 232 B.R. at 136.

reasonable period of time. The Debtor and her spouse have a combined annual gross income of approximately $40,000.00. They live a relatively comfortable lifestyle. Though not directly employed in her chosen field, there is little doubt that the Debtor profited from her education and generally relied upon it in obtaining her current employment. Her inability to address this obligation over the years arose primarily through a combination of unfortunate circumstances which allowed the amount of the indebtedness to grow beyond her ability to address it. While her current and future financial circumstances preclude the payment of all of the interest and attorney's fees which have accrued on the notes, the Debtor still has the financial capacity, in light of the anticipated length of her future working career, to address at least the principal and the interest which had accrued on the notes as of the state court judgment date. This solution rightfully acknowledges those policy principles under which student loans are generally declared to be non-dischargeable under § 523(a)(8), while also protecting the Debtor from the imposition of an undue hardship and the loss of her "fresh start" which would undoubtedly occur if she obtained no relief at all from the student loan obligations.

Accordingly, because the Plaintiff has established by a preponderance of the evidence that she could not maintain a minimal standard of living if forced to repay this student loan without any alteration of the obligations owing to the Defendant arising from the Travis County judgment, but that she could, in fact, address a significant portion of the obligation if a repayment schedule were to be reinstituted, the Court concludes that the relief sought by the Plaintiff's complaint will be granted in part and denied in part and that the student loan obligation due and owing by the Plaintiff, Lynda Marie Barron, to the Defendant, the Texas Guaranteed Student Loan Corporation, is hereby declared to be dischargeable pursuant to the provisions of 11 U.S.C. § 523(a)(8) as imposing an undue hardship upon the Debtor and her dependents, save and except for the sum of $9,432.09 which is expressly declared to be non-dischargeable. As to the nondischargeable amount, the Court shall, pursuant to its equitable powers codified in 11 U.S.C. § 105(a), restructure the debtor-creditor relationship between the Plaintiff and the Defendant by imposing a repayment schedule upon the parties which provides that the Plaintiff shall pay the non-dischargeable principal amount of $9,432.09 over a term of one hundred forty-four (144) months at $97.00 per month, which reflects an annual interest rate of 7% as provided in the promissory notes. Such payments shall commence by the Plaintiff on September 1, 2001 and continue for each month thereafter until satisfied in full. Any subsequent payment default by the Plaintiff under this prescribed schedule shall entitle to the Defendant to exercise any remedy which it may possess under applicable law. This memorandum of decision constitutes the Court's findings of fact and conclusions of law [25] pursuant to Fed.R.Civ.P. 52, as incorporated into adversary proceedings in bankruptcy cases by Fed. R. Bankr.P. 7052. An appropriate judgment will be entered which is consistent with this opinion.

---

**25.** To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.