**In re Kimberly HOLLINS, Debtor.**

**Kimberly Hollins, Plaintiff,**

v.

**United States Department of Education, Defendant.**

**Bankruptcy No. 01–32010–SAF–7.**
**Adversary No. 01–3346.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Nov. 22, 2002.

Robert M. Nicoud, Jr., Olson & Nicoud, Dallas, TX, for Plaintiff, Kimberly Hollins.

T.J. Johnson, Assistant U.S. Attorney, Dallas, TX, for Defendant, U.S. Department of Education.

### MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Chief Judge.

On March 12, 2001, Kimberly Elaine Hollins, the debtor, filed a petition for relief under Chapter 7 of the Bankruptcy Code. On June 22, 2001, Hollins filed this adversary proceeding seeking to discharge under 11 U.S.C. § 523(a)(8) the debts she owes to the defendant, the United States Department of Education (DOE). Hollins contends that repaying her student loans would impose an undue hardship on herself and her dependents. On July 30, 2002, the DOE filed a motion for summary judgment. The court held a hearing on the motion for summary judgment on September 5, 2002. At that hearing, the court ordered the parties to brief the second element of the undue hardship test set forth in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir.1987), regarding the post-repayment period of a student loan. The DOE submitted a trial brief on October 30, 2002. The court conducted a trial on October 30, 2002. At the conclusion of the trial, the court took the matter under advisement.

The determination of the discharge of a debt raises a core matter over which this court has jurisdiction to enter a final order or judgment. 28 U.S.C. §§ 157(b)(2)(I) and 1334. This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

### FACTS

In 1979, Hollins married Mr. Wilson. While married, Hollins secured eighteen student education loans—seventeen Federal Family Education Loan Program (FFELP) loans, formerly the Guaranteed Student Loan Program (GSL), and one Perkins loan—to attend Franklin University in Ohio for two-and-one-half years and Bowling Green State University for four years. Hollins pursued a degree in accounting/finance and attained ninety credits, but never completed the degree. Hollins testified that during her marriage, she endured several hospitalizations caused by Mr. Wilson's physical abuse. She testified that the problems of living in an unstable home, which included her husband's inability to maintain a steady job or earn much money, and his frequent jail incarcerations, lead her to miss classes and eventually leave school.

Hollins testified that she incurred loans in the late 1970's and early 1980's, which became due in 1987 and 1988. After receiving the first notice in 1987 or 1988 that her loans were due, Hollins went back to school full time, deferring her payments until 1994, when she stopped attending school. Alberto Francisco, a loan analyst with the DOE, testified that the debtor's loans originated in 1990–1994. However, Francisco later clarified that he did not know the origination date of the loans and that the debtor's loans were consolidated in 1999. Hollins did not contest that the loans had been consolidated.

In 1993 Hollins divorced Wilson and moved from Columbus, Ohio, to Denver, Colorado. In Denver, she worked for a bank as an accounting clerk, where she started at $12 an hour. After good performance ratings, Hollins received a raise and became a financial analyst earning $38,000 per year. She made no payments on her loans. She made no effort to contact the entities administering the FFELP or GSL loans. She did not provide any change of address to the loan administrators. She did not know that the loan administrators or their collection agency or the DOE attempted to contact her regarding payment.

In 1998 Hollins' employer, Imperial Bank, promoted her and increased her sal-

ary to $43,000 per year. The bank transferred Hollins to Houston. Diversified Collection Services, the collection agency for the student loans, caught up with Hollins in Houston, and demanded payment. Hollins testified that she offered to pay $500 per month. The agency demanded $1,200 per month. Hollins could not afford $1,200 per month. Hollins and the agency failed to reach an agreement on repayment terms. Believing payments of $500 per month without an agreement would be futile, Hollins testified that she made no payments.

In 2000 Hollins received another promotion and the bank transferred her to Dallas. During this period, Wells Fargo Bank acquired Imperial Bank. The agency contacted the debtor again demanding payment and similarly rejected her offer to pay $500 per month on her loans. Hollins remarried in September 2000 and shortly thereafter quit her job. She went back to work in November 2000 at Brinks Home Security earning a salary of $43,000. In September 2001 Hollins left that job due to medical reasons.

Since April 2002 Hollins has worked as a part-time loan officer for Amerinet Mortgage. She testified she works 50–60 hours per week to receive a commission-based salary, which to date amounts to a gross income of $6,000. She testified that she is currently seeking more profitable employment. Her forty year-old husband Frank is employed as a superintendent for a concrete company and earns between $2,800–$2,900 per month. Hollins testified that she and her husband cannot maintain their living expenses, which include monthly medical prescriptions for hypertension, triglycerides, depression and oxygen tanks for Frank. They are behind on their car payments and utility payments and had to change electricity service providers. Hollins further testified that she is forty-two

years old, that she has neither a physical nor a mental disability, and that she foresees working for twenty-five more years. The debtor and her husband have no children.

In its trial brief, the DOE asserts that the outstanding balance on the debtor's loans "as of October 22, 2002, is $87,459.42, which includes $72,637.46 in principal, $14,815.80 in interest and $6.16 in penalty amount." Def.'s Trial Br. at 2. In her original complaint, Hollins alleged that with the accrual of interest the total amount due on the debt is approximately $97,000. Compl. at 2, ¶ 4. At trial, Hollins submitted an exhibit demonstrating that the initial demand by Diversified Collection Services for the loans was $95,559.18 as of December 18, 2000. Pl.'s Ex. 1. The DOE does not claim fees and expenses included in the Diversified demand.

## DISCUSSION

■ Under § 523(a)(8) of the Bankruptcy Code, an individual may not, as a general rule, discharge any educational loans, regardless of whether the loans were used for tuition/books or room/board/living expenses. 11 U.S.C. § 523(a)(8); *see also In re Murphy*, 282 F.3d 868, 870 (5th Cir. 2002) (holding the purpose, not the use, of the loan controls whether the loan is within § 523(a)(8)'s educational-loan dischargeability exception). Section 523(a)(8) "was enacted to prevent indebted college or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans." *In re Nary*, 253 B.R. 752, 760 (N.D.Tex.2000) (quoting *In re Hornsby*, 144 F.3d 433, 436–37 (6th Cir.1998)). However, § 523(a)(8) permits the discharge of a student loan if the debtor can show that excepting the student loan from discharge would inflict

an undue hardship on the debtor and her dependents:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8).

■ The Bankruptcy Code does not define "undue hardship." Consequently, to determine whether undue hardship exists this court has adopted the three-prong test set forth in *Brunner*, 831 F.2d 395. *Nary*, 253 B.R. at 761. Under *Brunner*, to establish undue hardship, a debtor must establish:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner* 831 F.2d at 396.

■ Hollins has established the first prong of the *Brunner* test. Based on current income and expenses, Hollins cannot maintain a minimal standard of living for herself and her husband if she is forced to repay her student loans. Hollins' total monthly expenses equal $5,729.50. Pl's. Ex. 2. The DOE does not contest the amount or the appropriateness of those expenses. At her current commission-based job, Hollins testified that she averages $650–$700 in a monthly salary. Frank, the debtor's husband, brings home a monthly salary of $2,800–$2,900.

The DOE argues that the debtor is hopeful for the future, that she is actively seeking new and better employment, and that she has the potential to earn a higher salary. Currently, though, Hollins' and her husband's monthly expenses exceed their monthly income. *See Nary*, 253 B.R. at 763 (considering a non-debtor spouses's income and the potential for the debtor and his spouse to earn increased income, the district court upheld the bankruptcy court's finding that the debtor's monthly expenses exceeded his income, establishing the first prong of the *Brunner* test). Thus, based on the debtor's current income and expenses she cannot maintain a minimum standard of living if forced to repay her loan debt.

■ The second prong of the *Brunner* test looks to the future. Based on her prior employment record and her desire to obtain more lucrative employment, Hollins has not established that she will not be able to make loan payments, in some amount, in the future. The *Brunner* test considered "additional circumstances" that may cause a debtor's inability to repay her student loans "to persist for a significant portion of the repayment period of the student loans." Here, the loans are past due. Hollins is beyond the repayment period of the student loans. When the entire debt is due, the court can no longer consider whether circumstances will likely cause a debtor to be unable to make loan payments. The court must therefore determine how to apply the second *Brunner* prong after the student loans are due.

Hollins urges the court to adopt the approach used by the court in *In re Barron*, 264 B.R. 833 (Bankr.E.D.Tex.2001). In *Barron*, the student loan had matured. The Texas Guaranteed Student Loan Corp. (TGSLC) had obtained a judgment against the debtor. Like the instant case, in *Barron*, because of the entry of the judgment, there was no longer any repayment period for the loan. 264 B.R. at 841. The judgment could remain valid against the debtor throughout her life, if the TGSLC availed itself of remedies to keep the judgment from becoming dormant. The court reasoned that regardless of whether the debtor experienced any future improvement in her financial affairs, the debtor would never be able to satisfy the judgment. The TGSLC had assured the *Barron* court that it would not subject the debtor to immediate demands for the full satisfaction of the judgment. The court reasoned, however, that even the best assurances of TGSLC offered in open court does not alter the reality that TGSLC would have all available means of execution on the judgment available against the debtor without the debtor having any future prospect of income sufficient to satisfy the judgment. 264 B.R. at 841–42.

Like *Barron*, Hollins no longer has a scheduled repayment plan. Also, like *Barron*, the entire debt is due. But, unlike *Barron*, the DOE has not obtained a judgment against Hollins. While DOE could proceed to commence collection proceedings should the loans not be discharged, Francisco testified that the DOE would offer Hollins three alternative administrative repayment schemes before commencing collection actions. Unlike *Barron*, this testimony would judicially estop the DOE from commencing collection efforts without first offering the three administrative repayment schemes. Consequently, the court examines those programs, as explained by Francisco and as understood by the court.

First, the debtor could pay off her loans in full or make a negotiated one-time lump sum discounted payment, in exchange for a release of the balance of the debt. Second, the debtor could negotiate a reasonable and affordable payment plan, which would be based on the amount of the debt and the debtor's financial situation. Third, the debtor could enter an income contingent payment plan, which would be based on her annual income and her ability to make payments on her loans for the next twenty-five years.

Hollins cannot pay the loans in full. Her present income does not allow for the payment of a negotiated discounted lump sum while allowing her and her husband to have a minimum standard of living. Hollins has an earning capacity of $43,000, considerably more than her present income, but not sufficient to offer a discounted lump sum payment. Consequently, the first administrative option would not be available to Hollins in the foreseeable future.

Under the reasonable and affordable payment plan, Francisco testified that the DOE would consider the amount of the debt to establish a reasonable debt to pay and would consider the debtor's ability to make payments in relation to her income. Francisco testified that the amount of the debt to be serviced would be large because Hollins' outstanding debt is large. On the other hand, even considering her earning capacity, the debtor could not afford payments to service a large debt. As a practical matter, this program would not be available.

The income contingent payment plan would, however, be available and practical. Francisco testified that the DOE would have Hollins make monthly payments in an amount she could afford, adjusting the

payment annually based on her then current income and expenses. After 25 years of payments, the outstanding debt would be deemed paid in full and satisfied, regardless of the amount of interest and principal actually paid. Hollins has a proven earning capacity of $43,000 annually. She testified that she is actively seeking more lucrative employment. She further testified that she anticipates being in the work force for another 25 years, and that she has no health impediments. She and her husband have no dependents.

Consequently, her current state of affairs will not likely persist. She and her husband will have the means to make payments, in some amount, which would meet the DOE's income contingent payment plan, as understood by the court. Although Hollins would have to make payments for 25 years, her payments would be contingent on her income. She would only pay what she could afford. At the end, she would obtain a release. Thus, unlike *Brunner*, Hollins could invoke this program to preclude collection actions by the DOE. Hollins would not be confronted with an "all or nothing" situation that would persist throughout the foreseeable future, but rather would be offered an affordable income contingent payment plan. Hollins has therefore failed to establish the second *Brunner* prong.

■ Under the third prong of the *Brunner* test, the debtor must prove she made good faith efforts to repay her loans. "Factors to be considered include the number of payments the debtor made, attempts to negotiate with the lender, proportions of loans to total debt, and possible abuse of the bankruptcy system." *Barron*, 264 B.R. at 842. Further, "a lack of pay-

ment does not by itself preclude a good faith finding." *Nary*, 253 B.R. at 768.

■ Hollins has not made any payments on her loans. Hollins did not notify her student loan servicers of her move from Ohio to Colorado or her move from Colorado to Texas. While she endured and ultimately prevailed over personal problems, she nevertheless made no effort to address her loans until the collection agency located her in Texas.

When confronted with collection, she did, to her credit, offer to pay $500 per month. The collection agency inexplicably rejected that offer, demanding $1,200 per month. Hollins could not pay $1,200 per month.[1] No agreement was reached. The DOE took over the loans. Hollins demonstrated good faith in her negotiations with the collection agency.

But, in the larger picture, she has not demonstrated good faith. She made no payment over 20 years, a time during which she could have paid some amount. She did not keep the lender aware of her location or situation. The lender had to pursue her around the country. Hollins has, therefore, failed to establish the third *Brunner* prong.

Hollins has, as a result, not established that excluding the student loans from her discharge would cause her undue hardship. Hollins failed to exercise good faith by not making any loan payments over the years. With her earning capacity and the income contingent payment plan, Hollins can make loan payments that would ultimately result in the release of the outstanding debt. The DOE is therefore entitled to a judgment excluding the student loans from a discharge under Chapter 7 of the Bankruptcy Code.

---

1. It appears that over-demanding collection agency practices have worked to the detriment of the DOE in this case.

If a reviewing court concludes that this court has erred in its finding of no undue hardship, in the interest of complete findings, *Blockton Cahaba Coal Co. v. United States*, 24 F.2d 180, 181 (5th Cir.1928)(explaining "it was the duty of the trial court to make complete findings of fact upon all the issues"), the court will address Hollins' contention that she should obtain at least a partial discharge of the student loans. Under the Bankruptcy Code, the court may enter a partial discharge. *Nary*, 253 B.R. at 768. Thus, if repayment of the full debt constitutes an undue hardship, the court may, in effect, restructure the debt by a partial discharge, if a reduced debt would not be an undue hardship. In other words, the court may by a partial discharge eliminate the undue hardship. That would result in a non-discharged debt to be paid by a debtor, thereby fostering the Congressional policy of repayment of student loans albeit in a restructured amount to avoid undue hardship.

To determine a partial discharge, the court considers the period of time it would take the debtor to repay the entire loan, the monthly amount needed to pay the loan, and the interest rate. The court considers the debtor's income and earning capacity and her expenses, as well. *Barron*, 264 B.R. at 846–47.

Hollins cannot pay a debt of $87,459.42, with interest accruing at variable rates. Assuming a term of 10 years, Hollins could not afford a monthly payment that would amortize that debt.

Hollins' earning history reflects that she has a capacity to earn $43,000 per year gross pay. The court calculates that she would likely net $33,540, figuring 22% for taxes, social security and Medicare payments. Her husband earns approximately $35,000 per year gross pay. The court calculates that he would likely net $27,300.

Their combined net income would then be $60,840, resulting in net monthly income of $5,070.

Hollins scheduled their monthly expenses at $5,729.50. For purposes of the undue hardship analysis, the DOE did not contest those expenses. Nevertheless, the court must assess the reasonableness of the expenses to consider whether to grant a partial discharge. The court finds that the expenses must be reduced by $1,078, to $4,652 per month. Hollins lists telephone expenses of $200 per month, when $75 would be more reasonable. She provides for $200 per month for clothing, when $100 would be reasonable. She cannot budget income that could be used to make a payment to the DOE for student loans to buy clothing beyond the necessity. Laundry expenses must be reduced from $150 to $50 per month, transportation from $225 to $25, and recreation from $170 to $100. Most significantly, Hollins reports automobile payments of $1,080 per month. The court assumes that covers two vehicles, one for Hollins and one for her husband. But the court cannot attribute more than $600 as a reasonable monthly amount for automobiles.

With a potential for net monthly income of $5,070 and revised reasonable expenses of $4,652, Hollins and her husband would have available $418 per month. As unanticipated expenses may reasonably be expected, the court would budget $100 a month, leaving $318 potentially available to pay the DOE for the student loans.

Hollins suggests that interest should be at 8% per annum. The court takes judicial notice that the average long term United States Treasury rate is approximately 5%. Assessing 3% for the risks of a loan to Hollins, the court would expect an interest rate of 8%. The court takes judicial notice that the typical term for a student loan is at least 10 years.

Monthly payments of $318 over 10 years with an 8% interest rate results in a principal obligation of $26,210. Over the ten years, Hollins would pay total interest of $11,949.95 on that debt.

The court therefore finds that Hollins could pay a student loan of $26,210 at 8% per annum interest over 10 years. If a reviewing court determined that the court erred in its undue hardship analysis, the court would discharge all but $26,210 of Hollins' indebtedness to the DOE, plus interest of 8% per annum.

### ORDER

Based on the foregoing,

**IT IS ORDERED** that, under § 523(a)(8), the debt to the DOE is not discharged. Hollins has not established that excepting the debt from discharge will impose an undue hardship on the debtor. The DOE must offer the debtor the payment programs discussed in this memorandum opinion. Counsel for the DOE shall submit a proposed final judgment consistent with this order.